IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| In the Matter of a Petition By<br><br>Tabatha Spicer, Misty Silkwood, Deborah Rush, Jessica Wardlow, Shelby Brannum, Sheila Brown, Melynda Casey, Tammara Utley, April Ricketson, and Nichole Wilms. | No. _____<br><br>Verified Petition to Perpetuate Testimony |

1. Petitioners, by and through her undersigned counsel, hereby petition this Court for an order pursuant to Federal Rule of Civil Procedure 27, authorizing the issuance of a subpoena to take the deposition of former Ray County, Missouri, Commissioners David Powell and Robert King.

    a. Powell served as a Ray County, Missouri Eastern Commissioner from 2021 through 2024. Powell's address is Richmond, Ray County, Missouri.

    b. King served as Ray County, Missouri, Presiding Commissioner from 2019 to 2023. King's address is located in Richmond, Ray County, Missouri.

2. Pursuant to Federal Rule of Civil Procedure 27, Petitioners also request a hearing on this matter, to be scheduled no sooner than 21 days after the filing of this Petition. In accordance with Rule 27, Petitioners will serve a copy of this Petition and Notice of Hearing including the date, time, and place of the hearing, to all expected adverse parties, at least 21 days prior to the hearing.

3. Petitioners Tabatha Spicer and Jessica Wardlow are offenders in the Missouri Department of Corrections, and are currently housed at Chillicothe Correctional Center, 3151 Litton Road, Chillicothe, Missouri 64601. Spicer and Wardlow have been in the custody of the Missouri Department of Corrections since 2024. The remaining Petitioners are listed herein alongside their

1

residential addresses: Misty Silkwood, 6352 Sportsman Road, Lot 761A, Henrietta, MO; Deborah Rush, 2001 Franklin Avenue, Apt. 5, Lexington, MO; Shelby Brannum, 4305 South Mccoy, Independence, MO 64055, Sheila Brown, 14838 E. Adkins Drive, Excelsior Springs, MO, Melynda Casey, 21334 Hwy BB, Polo, Mo 64671; Tammara Utley, 20313 E. Thirteen Mile Rd., Roseville, MI 48066; April Ricketson, 8813 Thompson Avenue, Independence, MO; and Nichole Wilms, 23818, First Avenue, Mosby, MO.

4. At various times in the years 2021 through 2024, Petitioners were detainees incarcerated in the Ray County, Missouri, jail located at 200 W. 9th Street, Henrietta, Missouri 64036. While incarcerated at the Ray County, Missouri jail, Petitioners were subjected to (a) jail conditions that were intentionally punitive and not reasonably related to legitimate government purposes or were excessive in relation to those purposes in violation of the Fourteenth Amendment Due Process Clause and (b) jail conditions that constituted cruel and unusual punishment in violation of the Eighth Amendment. Petitioners anticipate bringing Fourteenth Amendment and Eighth Amendment conditions of confinement claims in a civil action, pursuant to 42 U.S.C. § 1983, against the entity and/or persons who subjected Petitioners to such conditions. This action would be cognizable in the United States District Court for the Western District of Missouri – Western Division.

5. The undersigned counsel, on behalf of Petitioners, recently made sunshine law requests to Ray County, Missouri, in part, so Petitioners can determine the identities (first and last names) of the persons who subjected Petitioners to the jail conditions giving rise to their anticipated civil action, for the purpose of filing the anticipated civil action against the appropriate parties. To date, partial documents have been produced in response to the sunshine law request. Accordingly, Petitioners are not yet prepared to file their anticipated action.

6. The purpose of this Petition is to obtain the deposition testimony of David Powell, a former Ray County, Missouri Commissioner. Powell is of an advanced age and is suffering from significant and deteriorating health conditions. Petitioners seek to perpetuate his testimony through deposition before Powell becomes incapacitated from illness. Powell's illness is not discussed in detail herein to protect his privacy. Should the Court require more details, Petitioner can file a more detailed statement under seal.

7. The purpose of this Petition is to obtain the deposition testimony of Robert (Bob) King, former Ray County Presiding Commissioner. King no longer serves in the role of Presiding Commissioner for Ray County, as he did not seek re-election in 2024. He is of an advanced age. Upon information and belief, King is approx. 87-years-old.

8. Powell and King have knowledge of the Ray County, Missouri jail conditions, the persons responsible for such jail conditions, and the Ray County, Missouri Commission's knowledge of the jail conditions, from 2021 through 2024, when Powell and King were Ray County, Missouri commissioners.

9. Specifically, as it relates to Petitioners, upon information and belief, Powell and King have the following knowledge, which relates to Petitioners' anticipated conditions of confinement claims, and upon which, Petitioners request to depose them:

    a. Ray County, Commission

        i. That upon information and belief, Powell personally toured the jail in 2021 in his capacity as Ray County, Missouri Eastern Commissioner;[1]

---

[1] See Jack 'Miles' Ventimiglia, *Minor Necessary Fixes in the Offing of Ray County Jail,* Richmond Daily News, Sept. 10, 2021; https://www.richmond-dailynews.com (accessed June 14, 2025).

ii. That in June 2021, the Ray County, Missouri Commission (hereinafter "the Commission") hired HMN Architects, LLC to inspect the jail and identify safety concerns;[2]

iii. That upon information and belief, in July, 2021, upon inspection of the jail, HMN Architect, LLC reported to the Commission that the jail was "a death trap," "a wood-fired pizza oven," and described the jail as having "dangerous conditions."[3]

iv. That HMN Architect, LLC issued a report to the Commission, identifying mold as an ongoing issue, plumbing and ventilation that violated the American Correctional Association (ACA) standards; and specifically noted, "[t]he most basic health, safety, and welfare needs were not met based on the construction [of the jail]."[4]

v. That in July 2021, Ray County, Missouri Sheriff Scott Childers asked Septagon Construction to conduct a site visit of the jail and identify structural issues; following that site visit, on July 23, 2021, Septagon Construction issued a report identifying mold, electrical, plumbing, and HVAC issues; Septagon Construction reported that the jail violated building codes and ACA standards, had inadequate heating and air conditioning, and provided "no fire protection at all…[which] is very

---

[2] See https://raycountymo.com/index.php/county-commission, June 21, 2021 Ray County, Missouri Commission meeting minutes, (accessed August 13, 2025).
[3] *See* Jack 'Miles' Ventimiglia, *It's a Death Trap,* Richmond Daily News, July 30, 2021; https://www.richmond-dailynews.com (accessed June 14, 2025).
[4] Exhibit A, HMN Architect report, July 2021.

4

problematic (lawsuit at best) when having incarcerated individuals who cannot exit the building without assistance."[5]

 vi. That "incarcerated individuals who cannot exit the building without assistance" in the event of a fire inside the jail, would include detainees incapacitated by becoming unconscious, by an ongoing miscarriage, and by serious illnesses, including seizures –all of which the Petitioners experienced while in the Ray County jail;

 vii. That upon information and belief, Sheriff Childers shared Septagon Construction's report with the Ray County Commission in July 2021;

 viii. That upon information and belief, the Ray County Commission did nothing to alleviate the dangerous conditions raised by HMN Architects LLC and Septagon Construction;

 ix. That upon information and belief, King and Captain Andrea Kreiling from the Ray County Sheriff's Office had this exchange at an open Commissioner's meeting in August 2021, regarding allowing detainees out of the jail due to its dangerous conditions:

**Kreiling:** a drawback with getting people out of the jail is that their presence helps offset costs. "It would be just my opinion to leave as many as possible in there so we're also getting revenue, because when they're on ankle monitoring, we're not getting anything." Getting people out of the jail should wait until the county is ready to act on jail upgrades. Income over the past three months from inmates came to $53,235 in May, $48,960 in June and $50,670 in July. "Right now, we get money back off these inmates because they're using products in the jail, services inside the jail." "When they are out, that is going to be a total loss."

**King**: "But, Andrea, what I'm really worried about is a lawsuit."

---

[5] Exhibit B, July 23, 2021 report by Septagon Construction.

5

> **Kreiling:** "Yes," the county making a good-faith effort to reduce jail issues, through repairs or replacing the jail, could be considered a mitigating circumstance in the event of a lawsuit.
>
> **King:** "That's my intention."[6]

    x. That the Commission did nothing from 2021 through 2024 to alleviate the known dangerous conditions in the jail;

    xi. That on October 27, 2021, King issued a public statement on behalf the Commission, stating in part, "We know [the jail is] not safe."[7]

    xii. That upon information and belief, Powell visited the jail again in July 2024 in his capacity as Ray County, Missouri Commissioner after complaints regarding the extreme and dangerous heat in the female detainees' pod;

b. Structure of Jail Facility:

    i. That the female detainees' pod, from 2021 through 2024, was inside a separate-standing small shed connected to the main jail structure by a narrow corridor;

    ii. That the shed which held the women detainees' pod was made of pressed tin or pressed metal;

    iii. That the women detainees' pod had no windows;

    iv. That in the summer of 2024, the women detainees' pod had no working A/C;

---

[6] *See* Jack 'Miles' Ventimiglia, *Ignore Jail, Invite Lawsuits?*, Richmond Daily News, Aug. 13, 2021; https://www.richmond-dailynews.com (accessed June 14, 2025).
[7] See https://fox4kc.com/video/conditions-worsening-at-ray-county-missouri-jail-sheriff-says/7099714 (accessed August 13, 2025).

6

- v. That the women detainees' pod had no fan during significant portions of time;
- vi. That often, the door to the women detainees' pod was intentionally closed, as a form of punishment, so airflow was cut off;
- vii. That the women detainees, including Petitioners, had no way of contacting jail staff when the women required assistance, as there was no call button inside the pod; therefore, the women detainees, including Petitioners, would spell out the word, "HELP" with playing cards near the surveillance camera inside the women detainees' pod, in the hope that jail staff would respond to them;
- viii. That the women detainees' pod had a door that was secured, at times, only by a set of handcuffs;
- ix. That the women detainees' pod, located in the back of the facility, reached perilous and dangerous temperatures in the summer of 2024, while other portions of the jail remained cool;

c. Heat

- i. That the women detainees, including some Petitioners, suffered from prolonged, stifling and dangerous heat in the summer months of 2024;
- ii. That the Commission did not adequately respond to reports of extreme and dangerous heat inside the jail, especially pertaining to the women detainees' pod;

7

iii. That on July 11, 2024, Ray County, Missouri Undersheriff Steve Mendoza requested a new A/C unit for the women's pod from the Commission;[8]

iv. That the Commission did not provide a new A/C unit for the women's pod;

v. That in order to combat the extreme heat, the women detainees, including some Petitioners, would remain completely disrobed inside their pod, because their uniforms were made of thick material, and they were not provided undergarments;

vi. That, in order to combat the dangerous heat, the women detainees would affix paper, using toothpaste as an adhesive, to cover the hot ceiling lights in an effort to lower the dangerous temperatures in the women's pod;

vii. That the women detainees, including some Petitioners, suffering from extreme and prolonged heat, developed rashes, experienced confusion and distorted thinking, lost weight and some lost consciousness and had seizures;

viii. That the heat was so stifling inside the women detainees' pod that the women detainees, including some Petitioners, struggled to breathe and had panic attacks because they were unable to breathe;

ix. That the women detainees, including some Petitioners, begged the jail staff for relief from the extreme, dangerous heat, such as requesting a fan

---

[8] See https://raycountymo.com/index.php/county-commission, July 11, 2024 Ray County, Missouri Commission meeting minutes, (accessed August 13, 2025).

8

for airflow or simply opening the women's pod door leading to the men's pod, which had air conditioning;

x. That on various occasions, the women detainees, including some Petitioners, were given a fan for their pod due to the extreme heat, but the fan was removed from their pod in retaliation for their complaints about the extreme heat;

xi. That on various occasions, in retaliation to the women detainees' complaints about the extreme and dangerous heat, including some Petitioners, jail staff closed the only door connecting the women detainees' pod to the rest of the jail, resulting in the women's pod becoming a dangerous heat trap with no ventilation or air flow;

xii. That on July 14, 2024, the heat was so dangerously extreme inside the women's pod, that Petitioner Natosha Romano had seizures in response to the heat;

xiii. That after the women detainees pleaded for help for Petitioner Romano, jail staff refused to respond to assist;

xiv. That the women detainees performed first aid to Petitioner Romano to keep her alive, after jail staff refused to respond;

xv. That upon information and belief, a female detainee was able to communicate the health emergency to an individual outside of the jail, and that individual called 911, resulting in an ambulance responding to the Ray County, Missouri jail, to assist Petitioner Romano;

xvi. That on another occasion during the summer of 2024, a woman detainee was rendered unconscious due to the extreme heat, and had to be carried out of the jail on an ambulance stretcher;

xvii. That on yet another occasion during the summer of 2024, Petitioner Tammara Utley lost consciousness due to the extreme heat;

xviii. That the women detainees, including some Petitioners, would run the cold water in the women's shower inside the women's pod in a desperate effort to combat the extreme heat, and that when they did, jail staff would make the women shut off the water;

xix. That the women detainees, including some Petitioners, suffered from heat rash and some women's heat rash became open sores;

xx. That the women detainees, including some Petitioners, reported to family and friends outside the jail, begging for assistance to get relief from the heat;

xxi. That in the summer of 2024, Petitioner Tabatha Spicer repeatedly complained to Connie and Dawn Powell, the wife and daughter of David Powell, about the extreme and dangerous heat;

xxii. That in the summer of 2024, Dawn Powell contacted the jail requesting assistance for the extreme heat in the women's pod, and specifically requested to open a door to the women's pod, however, jail personnel reportedly had no key to open the door, so the door remained shut;

xxiii. That in response to Petitioner Spicer's complaints, Connie and David Powell made an unscheduled visit to the jail in 2024;

d. Lack of Medical Care

   i. That female detainees, including Petitioner Jessica Ward, were not provided adequate medical services or any medical care for severe withdrawal symptoms from alcohol and drugs while in the jail, though they were exhibiting profound physical distress and pleaded for assistance;

   ii. That female detainees, including Petitioner Ward, experienced severe withdrawal symptoms, including sweats, diarrhea, uncontrolled shaking, nausea, and an inability to sleep or eat;

   iii. That female detainees, including some Petitioners, did not receive regular prescribed medications causing severe medical conditions that required emergency services;

   iv. That Petitioner Nichole Wilms had repeatedly complained of abdominal cramping to jail staff and disclosed that she believed she was pregnant;

   v. That jail staff gave Petitioner Wilms an expired pregnancy test, which produced negative results for pregnancy for Petitioner Wilms;

   vi. That when Petitioner Wilms continued to insist she was pregnant and complained that the pregnancy test was expired, jail staff disregarded her complaints;

   vii. That days later, Petitioner Wilms miscarried inside the women's pod.

e. Sanitation

i. That women detainees, including some Petitioners, were frequently forced to stand in raw sewage as a result of toilets that regularly overflowed;

ii. Out of a total of four toilets, only two were functional in the women detainees' pod. Yet the two functional toilets were in a constant state of disrepair and contained large amounts of raw sewage at all times and frequently overflowed;

iii. That due to the raw sewage, gnats infiltrated the women's pod, particularly around the toilets;

iv. That as toilets overflowed, on occasion, the raw sewage rose to their ankles in their pod;

v. That at times the raw sewage would seep inside the female detainees' shoes;

vi. That the female detainees, including some Petitioners, would repeatedly request the raw sewage be cleaned from the floor and those requests were regularly denied;

vii. That the raw sewage would eventually recede and over time would dry up on the floor inside the women detainees' pod;

viii. That women detainees, including some Petitioners, became ill from exposure to the raw sewage experiencing prolonged sore throats that were so painful it was uncomfortable to speak;

ix. That women detainees, including some Petitioners, laid full snack boxes of expired breakfast cereal on the sewage on the floor, creating "stepping stones" inside their pod, so they could attempt to avoid the raw sewage;

x. That staff refused to clean up the raw sewage;

xi. That when the women detainees, including some Petitioners, complained about the raw sewage to staff, staff responded, "you made the mess; you clean it up," but rarely gave women appropriate cleaning supplies to clean;

xii. That the women detainees, requested use of a shop vac to clean the sewage themselves, but were denied by jail staff because they did not want to supervise the women detainees during cleaning;

f. That the women detainees' pod had ants, gnats, and spiders, and that women detainees suffered spider bites from what was believed to be brown recluse spiders;

g. That women detainees, including some Petitioners, were exposed to pervasive black mold inside the women's shower, and women became ill, including coughing, watery eyes, fatigue, skin rashes from what is believed to be exposure to black mold;

h. That women detainees, including some Petitioners, made make-shift cleaning supplies out of left-behind clothing from other women detainees to clean the raw sewage on the floor and black mold in the women's shower;

i. That women detainees would conceal cleaning supplies in a shampoo bottle so that jail personnel would not take it away in retaliation for complaints;

j. Cold

13

      i. That women detainees, including some Petitioners, also suffered from extremely cold temperatures inside the women's pod during the winter months; and when they complained to jail staff, no adequate measures were taken to combat the cold;

      ii. That the women detainees, on their own, to combat the cold inside the women's pod, would run the hot water through the shower inside their pod, for the purpose of warming up the pod with steam from the hot shower, and that the women detainees would huddle together to share body heat in attempts to stay warm, while others walked in a constant path to increase their body heat;

  k. Disparate Treatment of Women

      i. That female detainees were prohibited from becoming Trustees at the jail;

      ii. That Trustees were male detainees who were given special privileges;

      iii. That jail personnel exhibited a widespread cultural hostility to the female detainees and a practice of retaliation and disregard for their basic needs;

      iv. That women detainees were denied undergarments by jail staff so the women detainees made their own underwear from t-shirts and rags;

      v. That women detainees, including some Petitioners, were rarely given menstrual pads or tampons, and, as a result, women detainees bled on and through their jail uniforms, on the floor, and on their mattresses;

10. Additionally, Petitioners believe David Powell and Robert King have the following information related to their anticipated conditions of confinement civil action, and request

to have the opportunity to depose them about the following, before their health further declines. The following information relates to years 2021 through 2024:

    a. That jail staff retaliated against the women detainees, including Petitioners, by (1) taking away food if they complained of hunger, (2) removing a temporary fan when they complained of heat, (3) shutting the door that connected the women's pod to the rest of the jail and thereby, cutting off the women's only source of airflow, if women detainees complained of heat, (4) when women detainees ran the cold water in the shower to combat the extreme heat inside their pod during summer months and ran the hot water in the shower to combat the extreme cold during winter months, jail staff made them turn off the water or threatened the women detainees with discipline or simply, shut the water off to the women's pod; (5) on one occasion a male jail staff member entered the women's pod and ripped the sheets and pillows off the women detainees' beds and threw the women's items on the floor and against the wall in a rage, in retaliation for women detainees complaining about him.

11. Powell and King's testimony regarding the foregoing subject matters is necessary to Petitioners' anticipated civil action. Petitioners are not prepared to file their civil action yet, and it may be additional weeks before Petitioners are prepared to file. Powell is reportedly seriously ill, with a limited amount of time from progression of a disease. King is of advanced age. Petitioners fear that Powell and King will be unable to provide testimony prior to their filing of their civil action, and therefore, seek to perpetuate his testimony through deposition.

I respectfully request that the Court issue an Order authorizing the Petitioners to take the deposition of Mr. David Powell and Mr. Robert King for the purpose of perpetuating their testimony.

Dated: 9-4-25

Signed: *Jean Peters Baker*
Jean Peters Baker
Missouri Bar No. 47238
Counsel for Petitioners

STATE OF MISSOURI )
) ss.
COUNTY OF Jackson )

On this 4th day of September, 2025, before me, personally appeared Jean Peters Baker, known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same for the purpose therein contained.

Notary

My commission expires:

RYAN CADWALLADER
Notary Public - Notary Seal
STATE OF MISSOURI
Jackson County
My Commission Expires: 01/06/2029
Commission #25244803