# Jean Peters Baker

### Attorney at Law
4050 Pennsylvania
Kansas City, Missouri 64111
jean@petersbakerlaw.com
816-730-4043

Sent via email to Steve Coronado at scoronado@fpsslaw.com and Jacob Bielenberg at jbielenberg@fpsslaw.com

July 10, 2025

Ray County Commission
Heather Maulsby, Ray County Clerk
100 W. Main Street
Richmond, Missouri 64085

RE:     demand on behalf of my client, Shelby Brannum, former Ray County jail pretrial detainee

Dear Commission:

I represent Shelby Brannum in her 42 U.S.C. § 1983 14th Amendment conditions of confinement, and 14th Amendment equal protection claims against the Ray County Commission, and in their individual capacities, Ray County, Missouri jail staff Bob Swindler, Tony (last name believed to be Lamar), Sky Glenn, and former Sheriff Scott Childers. She was incarcerated at the Ray County jail from June 27, 2024 through October 2, 2024, for a total 67 days, as a pretrial detainee. While incarcerated at the Ray County jail, she experienced the following:

I.      Conditions of Confinement

A.      Uninhabitable conditions in the women's pod

1.      Unbearable heat

With no working A/C in the women's pod, the only A/C the women got, was the spillover from the A/C in the men's pod, when the door to the women's pod was propped open. But most of the time, staff shut that door, sealing the women inside their pod, and greatly increasing their risk of heat exhaustion, heat stroke, and seizures triggered by the heat.

The women detainees, including Shelby, repeatedly requested relief from the extreme heat. Their requests were met with reprisal and arbitrary denials and were often mocked.

The women detainees, including Shelby, covered the ceiling lights with pieces of paper glued with toothpaste to get some relief from the heat. The lights served as heat lamps in the extreme temperatures within the women's pod. They also glued pieces of paper with toothpaste over

**EXHIBIT 1**

open vents in the ceiling, to block the hot attic air from flowing into their pod. When discovered, staff would remove the paper, knowing the women were attempting to alleviate their exposure to the extreme heat.

Women detainees, including Shelby, frequently ran the cold water in the shower to keep from overheating; but when discovered, staff shut the water off and threatened the women with discipline if they continued to run the cold water.

To combat the extreme heat, the women detainees, including Shelby, would strip off their hot sweat-soaked uniforms and lay naked on the concrete floor to help regulate their temperatures—the same floor that was often caked with sewage. The staff, observing the women on the contaminated floor, did nothing to protect them from the unsanitary conditions, which exposed them to disease and infection. Instead, staff threatened the women with discipline, and even criminal charges for indecent exposure for disrobing; however, staff offered no relief for the heat.

At night, the women detainees, including Shelby, would position their mattresses on the floor near the door to gain a little ventilation from the hallway fan blowing some air into the women's pod. But even when they did that, the ventilation from the fan was insufficient to make them comfortable enough to sleep. Besides, this option was only available to them, when staff had not removed the fan or shut their door in retaliation for making complaints about the heat.

On another occasion, Shelby and the other women detainees requested ice cubes from jail staff to battle the extreme heat. Staff arbitrarily denied their request, because, according to them, ice cubes could be used as weapons; on the other hand, that same jail staff frequently gave the women detainees sharpened pencils to keep inside the women's pod.

At another time, Shelby momentarily felt relief when a jail guard, wearing a hooded long-sleeved sweatshirt, came back to the women's pod to address complaints about the heat. But she quickly realized that his purpose was to shut off the fan to punish the women for complaining. He then mocked the women, by making a shivering gesture to indicate how cold he was from sitting in the staff's section of the jail. As he mocked them, the women detainees were dripping with sweat from simply sitting inside the women's pod in the coolest parts they could locate.

On the hottest days, Shelby estimated the women's pod got as hot as 115 degrees. Unsurprisingly, Shelby experienced a variety of conditions from the prolonged and extreme heat. She had a series of ███ on her underarms, inside of her elbows and on her inner thighs. These ████ remained constant for weeks no matter the number of cold showers she took. She also experienced ████████ ████ - ███████ █████ █████ and ████████ She often struggled to breathe and frequently felt on the verge of passing out.

2. <u>No basic hygiene</u>

Female detainees rarely received necessary tampons and sanitary napkins. When they did, they did not get a sufficient supply—as a result, the women often wore tampons and napkins longer than they should, which exposed them to infection and toxic shock syndrome. At other times, they simply bled on themselves because they had no other option. While laundry was supposed to occur weekly, that was not always followed. So female detainees, including Shelby, would sit in her blood-stained uniforms for days or weeks at a time.

Moreover, the women rarely received soap; and would wash their uniforms inside the sink in the women's pod, while waiting days until staff did laundry. This is the same sink the women used to wash their hands before eating.

3. <u>Unsanitary conditions</u>

In the women's pod, there were 4 toilets. At least one of those toilets never worked during Shelby's period of detainment. Staff kept a trash bag over it, though it remained in that state, filled with fecal matter. When one of the other toilets overflowed, raw sewage flowed onto the floor, which was a combination of one or more the following: fecal matter (at times in the form of diarrhea from a detoxing detainee), urine, dirty toilet water, used toilet paper, vomit, and menstrual blood.

Almost always, the raw sewage, deep enough to seep in Shelby's and the other women's shoes, remained on the floor until it evaporated. One of the toilets would not flush and held stagnate sewage of fecal matter, urine, vomit and menstrual blood. Shelby, and the other women detainees, had no choice but to constantly stand in, and to breathe in, the contaminants from the raw sewage, which exposed them to disease and illness.

Their pod, as you know, was small, and had no windows and no ventilation, making the stench unbearable. Gnats, which carry disease, swarmed over the raw sewage on the floor and in the toilets. Additionally, an infestation of spiders caused Shelby to have a spider bite on her leg. The bite became red and swollen. Shelby was not the only female detainee to have spider bites from the Women's pod.

The women detainees, including Shelby, repeatedly complained about the raw sewage to jail staff—requesting that staff clean it or that staff give them cleaning supplies so they could clean it themselves. In response to those complaints, staff retaliated against my client and the other women by (1) refusing to clean the sewage up from the floor, (2) refusing to give the women cleaning supplies so they could clean it up themselves, (3) refusing to repair the toilets, and (4) purposefully shutting the only door connecting the women's pod with the rest of the jail, intentionally forcing Shelby and the other women to breathe in the toxic fumes from the sewage for the sole purpose of punishing them for complaining about intolerable conditions.

On at least one occasion, raw sewage rose ankle deep after a toilet flooded. The female

3

detainees had no choice but to stand in ankle deep sewage.

Shelby contracted a urinary tract infection during her confinement, which she believes was due to the unsanitary conditions and lack of any medical treatment. This caused her to have frequent urination and a burning sensation when she urinated. She also experienced cramping without any medical attention though she complained and requested help for her symptoms.

4. <u>A female detainee's heat-induced seizures</u>

A female detainee disclosed to Shelby that she had specific concerns about her health. This detainee reported experiencing █████ in the past and believed the heat could cause additional seizures to occur. That detainee informed jail staff of her condition, but she was disregarded. That detainee worried that jail staff would not help her if she succumbed to █████ and feared she could die inside that cell. Shelby confided in this detainee that Shelby would be specifically watchful of her and promised her that she would be there to help her if her health worsened or if she had a seizure.

In mid-July 2024, the female detainee's fears were realized. She began having █████ one evening inside the women's pod. As promised, Shelby quickly noticed and rushed to the female detainee's aid. Shelby observed the female detainee's eyes roll back in her head, her body lock up, and tongue-biting. Panic filled the pod. The women detainees stood in front of the surveillance cameras, screaming for help. They loudly yelled and pleaded for help, and they asked the nearest pod of men to get them a guard. But staff did not respond. Instead, the guard, Sky Glenn, said in response, he was busy because he was handling a booking.

The women detainees' level of panic began to grow without help. Without training, but out of necessity, Shelby began performing chest compressions on the █████ detainee. Shelby tried to get the other detainees to calm down but to continue to adamantly demand help. With no jail staff responding, other female detainees contacted individuals outside of the jail to send an ambulance to the women's pod. Shelby continued to provide chest compressions. She was mindful of sticking her finger in the detainee's mouth for fear the detainee would bite her finger, but Shelby also worried about the detainee biting her own tongue, because she could see her clenching her mouth and biting down during a █████ These █████ continued until a member of law enforcement arrived. The law enforcement officer eventually helped Shelby move the detainee to the shower. The law enforcement officer told her that he would stand outside the shower while Shelby helped cool the seizing-woman's body down. Shelby's uniform was drenched as she stood in the shower trying to save a fellow detainee. Finally, paramedics arrived, approximately 40 minutes later. The seizing detainee was removed from the jail via stretcher and received medical intervention. At no time prior to the ambulance arriving did staff respond to assist the seizing woman.

The female detainees, then, found themselves handcuffed and placed outside in the yard. Shelby said it immediately felt cooler outside than inside the women's pod, even though it was an exceptionally hot day. As hot as it was outside, it was a relief from the heat inside the women's pod. Shelby distinctly remembers feeling that relief from the extreme heat while

seated outside on the ground in handcuffs. A transport bus then picked up the women detainees and took them to Caldwell County's detention facility due to the dangerously hot conditions in the Ray County women's pod. Shelby also remembers experiencing the air conditioning on that transport van as serving as a life saving measure to her and other women on that transport. The women spent the next few days in Caldwell County before they were returned to Ray County.

### B. Unsanitary conditions resulted in a pink eye breakout

Shelby contracted ██ ██ during her detainment and noticed it was being contracted by other women in the pod. Her eyes were red and irritated. Shelby believes the pink eye was caused by the unsanitary conditions of the jail. Shelby requested eye drops from staff but was denied.

### C. Inadequate amount of food

One of the worst conditions was the lack of food. The women detainees, including Shelby, would attempt to ration their food to stave off hunger. Shelby would have difficulty going to sleep due to her hunger but also would awaken from hunger pains in the middle of the night. By way of example, some detainees, including Shelby, would save half of their meager bologna sandwich for later in the day when the hunger pains kicked in. On one occasion, Shelby was provided a packet of Tums by one of her fellow female detainees. She ate those Tums to help satisfy her hunger. Shelby complained about her hunger to Bob Swindler and asked him for more food. His reply was that he could give her less food for complaining—and that's precisely what he did. The following day and for the next three days, Shelby and the rest of the women detainees got even less food.

Shelby lost weight during her time of incarceration. She repeatedly complained about the lack of food to jail staff, but not only did they fail to address her concerns, they retaliated by providing less food after the complaint was lodged.

## II. Violations of Equal Protection

### A. Inadequate staff response

Unlike the men's pod, the women's pod and the ad seg cell used for the women were at the very back end of the jail, and although there was a video surveillance camera in the women's pod, staff never conducted cell checks of the women's pod. For the women detainees, especially Shelby, it was nearly impossible to request emergency assistance from staff. Shelby, out of necessity, took on a life-saving role inside of the women's pod. The women's screams for help went unheard, as was the case with the female detainee who had a miscarriage in 2024, the female detainee who had a heat-induced seizure in 2024, and a women who became unconscious due to the extreme heat in 2024. With no cell checks and no assistance button to alert staff, the women detainees, including Shelby, desperately attempted to request help from staff by waving at the surveillance camera and mouthing the word, "help," and spelling out the word, "help" with playing cards on the table and floor of the women's pod—hoping staff would see it on the surveillance camera and respond. But

they rarely did—or if they did, their response was inadequately delayed. This was intolerable, and resulted in an insufferable indignity to the women detainees, including Shelby, and created a condition which constituted a serious hazard to the women's health and safety.

### B. Women's Clothing

Women detainees, including Shelby, were treated significantly worse than their similarly-situated male detainee counterparts. To start, the jail uniforms were one piece that buttoned up the front. However, the female uniforms always had buttons missing around the breast and crotch area. They complained about the uniforms, asking for uniforms that covered their private areas, but nothing was done. Furthermore, staff removed women's bras and underwear upon intake, but provided no replacements, leaving the women's breasts and crotch exposed in their jail uniforms.

With no bra and underwear, a jail uniform with missing buttons in the breast and crotch areas, caused the women to be constantly vigilant of how they moved around in the jail so as to not expose their breasts or crotch areas any more than they already were. Often, male staff would admonish the women for being in stages of undress and threaten them with additional charges of indecent exposure, when the women disrobed in order to combat the extreme heat.

Women detainees often made make-shift "bras" and "underwear" from clothing left behind by women detainees who had been released from jail. These women, having experienced the same, intentionally left some of their clothing behind for the remaining women to use as "bras" and "underwear."

### C. Inappropriate Sexual Overtures

Male detainees, who were trustees, were permitted to crawl into the attic space above the women's pod and peer into the women's pod through the hole in the ceiling where the light fixture used to be. The male detainees would peer at the women as they were in various states of undress. One of these areas where a male detainee could see through a hole was over the only shower area provided for the women.

When the female detainees left their pod for any reason, they walked down a long hallway with a guard. The male detainees would catcall the women as they passed and never with rebuke by a guard. This hallway was known by female detainees for unwanted sexual comments, gestures and harassment directed at the women, adding to the already demeaning treatment they endured.

### D. Sanitary Napkins and Tampons

Women were denied access to feminine hygiene products and bled on themselves and made their makeshift sanitary napkins from clothing left behind by former female detainees.

### E. Recreation: Outside Movement and Trustee Privilege

Jail policy stated: "Recreational Time will be attempted to be offered in the exercise area 1 time per week, weather permitting, if there is sufficient Facility Staff on duty, and privileges have not

6

been taken away." When my client was in your jail, she and the other women detainees were never permitted to go outside in the recreational yard. Whereas the male detainees were permitted to be trustees and freely move around the jail – inside and outside—including to the "exercise area." Women were not permitted to be trustees. Jail staff clearly applied the policy disparately between the men and women.

F. Recreation: reading materials

Per jail policy, men were allowed to have "1 soft bible, and 2 soft bound books" which could be "exchanged at book cart time." They were also allowed, "1 pair of eyeglasses, 1 writing tablet, [and] anything bought off commissary." Per jail policy, women were not allowed to have any of those items in their pod.

G. Recreation: Netflix

Men detainees were given access to Netflix on the T.V. in their pod; the women detainees did not have this privilege.

H. Basic Necessity: Working A/C

As previously discussed, women had no working A/C in their pod; the men did. That is no more evident than what occurred in mid-July 2024 wherein a female detainee had a heat-induced seizure, and jail staff, with the Commission's blessing, made the decision to move the women detainees from the Ray County jail to the Caldwell County jail on an emergency basis, due the dangerous heat conditions in the women's pod. After a few days the women returned back to the Ray County jail, but soon thereafter, the extreme heat conditions returned.

III. The Commission were aware of the conditions

I will not repeat myself here, but I corporate by reference as though fully set forth herein, the section regarding the Commission's knowledge of, and deliberate indifference to, the deplorable jail conditions, discussed in my demand letter on behalf of my client, Deborah Rush.

Demand

Shelby demands            to resolve all claims against the Ray County Commission, and the individuals named in this demand letter. This demand will expire on August 11, 2025.

Sincerely,

Jean Peters Baker

### *Jean Peters Baker*
#### Attorney at Law
4050 Pennsylvania
Kansas City, Missouri 64111
jean@petersbakerlaw.com
816-730-4043

Sent via email to Steve Coronado, counsel for the Ray County Commission, at
scoronado@fpsslaw.com on August 12, 2025.

August 12, 2025

Ray County Commission
Heather Maulsby, Ray County Clerk
100 W. Main Street
Richmond, Missouri 64085

RE:     Demand on behalf of my client, Melynda Casey, former Ray County Jail Detainee

Dear Commission:

I represent Melynda Casey in her 42 U.S.C. § 1983 8th Amendment conditions of confinement and 14th Amendment equal protection claims against the Ray County Commission and in their individual capacities, Ray County, Missouri jail staff Bob Swindler, Undersheriff Steve Mendoza, Melanie Pumphrey, and former Sheriff Scott Childers. She was incarcerated at the Ray County jail from June 15, 2023 to June 21, 2023, as a pre-trial detainee.

> **I.     Ray County Commission knew of the dangerous conditions inside their jail since the summer of 2021, but deliberately chose to do nothing.**

In my former career, directly and indirectly, I was exposed to many poor jail conditions, but those conditions cannot match the inhumanely cruel conditions as those in your jail. The women who found themselves in your jail were subjected to the worst conditions, creating not just an unbearable environment to endure, but a dangerous one. There is no question you knew about these inhumane, and often times, life-threatening, jail conditions, and yet, you completely disregarded them. Ray County's explicit disregard for the lives of female detainees is particularly disturbing.

Sheriff Childers, who ran the day-to-day operations of the jail, requested Ray County hire HMN Architects in the summer of 2021 to do a review of the jail. You agreed. Although absent from your meeting minutes, I believe you also approved the employ of Septagon Construction to do a review of the jail.

After conducting their review, Septagon and HMN reported numerous problematic issues to you and Childers, but there was one singularly reported issue that stands out as life-threatening in nature: **the jail was a furnace oven during the blistering Missouri summers. You have known this since, at least, the summer of 2021; however, there is evidence that you knew before this**

1

**date.** I am aware that former Carrollton, Missouri Police Chief Robert (Bobby) Turner stopped housing his inmates in your jail due to the poor conditions sometime during his tenure (2013 to October 2019). I expect to learn there were other police chiefs who felt the same. Regardless, you were certainly aware in the summer of 2021.

On July 9, 2021, after conducting a site visit of your jail, HMN was so alarmed at its conditions, that they sought the opinion of Jordan Bartholomew, an electrical engineer. Mr. Bartholomew opined about your jail: there is "likely not enough (or none at all) conditioned outdoor air being delivered and what exhausts they do have for the jail is sucking in the raw outside air through gaps in the construction." Mr. Bartholomew's opinions were shared with you in July 2021.

On July 14, 2021, in its report, HMN warned you that "[t]he mechanical systems in the facility appear to be residential forced air units with air distributed in the attic with both sheet metal duct and flex duct. It is an inefficient method and not code compliant for the occupancy."

On July 23, 2021, Septagon warned you of the same in its report and noted that the jail had a "sheet metal roof" and "sheet metal screwed to the trusses for a ceiling."

On July 30, 2021, HMN Architect Shawn Harding called your jail "a death trap" and "a wood-fired pizza oven". He also said the jail failed fire safety and American Correctional Association guidelines. (*See* Richmond Daily News, "Politics Aside, Ray County needs a new jail," published online July 30, 2021).

One does not need to be an architect or an electrical engineer to understand those warnings. It was clear in the summer of 2021 that the residential AC units in the jail were sized for homes and could not possibly provide the necessary cooling power to handle the larger volume of air and increased heat load in a commercially sized building, like your jail. Moreover, the sheet metal roof and ceiling acted as thermal conductors—transferring heat from the outside into the jail during the hot summer months—turning the jail into a hot, "wood-fired pizza oven."

But unfortunately, it does not stop there. The women detainees reportedly had no working AC unit inside their G-pod, instead they relied on the unpredictably sullen nature of which corrections officer on duty. The only AC the women detainees received was through their cell door, propped open to capture some of the spillover AC from the men's general population cell. However, in the blink of an eye, a corrections officer would slam that door shut, in an attempt to mete out punishment, sealing the women detainees inside their G-pod with no air flow.

And your response to the life-threatening issue that you were fully aware? Nothing. Instead, you and Childers allowed your antagonistic relationship with each other to override the safety of the lives of the women (and men) trapped in your jail. Childers said as much in a June 16, 2021 Facebook video posted by him on the Ray County, Missouri, Sheriff's Office Facebook page. He said that he had been misled by you into believing that some of the $6M covid funds would be available to help with the jail; instead, he learned that none of those funds would be used to help with the jail. I look forward to discovering your priorities for the covid funds; for example, I know that you spent approximately $150K on a John Deere tractor in 2020, that you failed to inform the public, and as a result, admitted to violating Missouri's Sunshine Law. (*See State of Missouri v.*

*Ray County, Missouri;* 21RY-CV00228). According to your admissions in this lawsuit, you spent $2.7M of covid funds in May 2020, without first providing notice to the public in violation of Missouri's Sunshine Law. I expect to discover your priorities with the use of the Covid and other funds, particularly upon learning of the life-threatening conditions inside your jail.

In addition, on October 27, 2021, after Childers gave a tour of your jail to Fox 4 KC, Commissioner Bob King released the following cryptic statement: "**We know [the jail is] not safe**. We're trying to figure out what we can do to help [Sheriff Scott Childers]. We're willing to work with him any time he wants to work with us. We want the best for Ray County that we can get." (*See* https://fox4kc.com/video/conditions-worsening-at-ray-county-missouri-jail-sheriff-says/7099714).

It is unclear exactly what Commissioner King meant when he stated: the Commission is willing to work with Childers "any time he wants to work with us." I suspect, and certainly discovery in a lawsuit will reveal the answer, the acrimony between the Commission and Childers was related to the Commission's denial of funding for (1) sunlight barrier tunnels; (2) air purifiers; (3) dehumidifiers; and (4) an industrial washer and dryer—all requested by Childers from you at the August 31, 2024 Ray County Commission meeting. As you know, because Childers explained to you, these items were necessary to help reduce mold and mildew, which was rampant inside your jail, and to help make your jail somewhat more code compliant (that it was not) under the American Correctional Association guidelines.

After her release from custody, my client spoke to some candidates seeking elected office in Ray County for Sheriff and County Commissioner. She detailed the conditions inside the jail and especially those of the women's pod to Candidate Bobby Don Davis and Candidate for Sheriff Gary Blackwell and the lack of response by jail staff. Both candidates made it clear that they would address these conditions. Once elected, Sheriff Blackwell closed the jail on his first day in office and provided another tour of the facility to news media. (*See* https://www.kshb.com/news/local-news/youre-going-to-see-it-like-it-was-new-ray-county-sheriff-closes-jail-gives-tour-to-answer-questions). Sheriff Blackwell also hired a consultant to review the jail and provide a report.

## II.     Heat in the G-pod

This jail was essentially a large metal shed. (*See* "Whose county is Ray County? Yours," editorial piece in June 2021 in The Excelsior Springs Standard, describing your jail as a "large metal shed that is falling into disrepair, despite years of patching to hold the place together."). This type of structure made your jail conducive to soaring heat levels—couple that with no working AC in the women's G-pod.

## III.     Medical requests were ignored

Melynda had a ███████████ requiring medication to maintain her health. She had a prescription for medications for her ███████ arrhythmias, to regulate a fast heartbeat. The prescribed drug is called Metoprolol that manages her ███████ ███████ SVT. Melynda's prescribed medications were brought to the jail the first day she was detained on a charge that was

3

later reduced to a peace disturbance, a class B misdemeanor violation. And during her intake she pleaded her extreme need to have her prescribed medications that were sitting at the front desk.

Though her medications with the prescriptions were delivered to the jail on her first day of detention, she never received them. She repeatedly requested them from jail staff. Because she did not receive her medication, Melynda suffered ███████████████████████ and a ███ ████████ during her incarceration. Melynda attempted to lower her heart rate through techniques used to manage stress but her condition was also negatively impacted by the high temperatures within the G-pod. Melynda explained to any jail staff she could find that her medication was necessary for her ███████████████ and a sudden discontinuation of this drug could cause a heart attack. Yet, she was not given the drugs by jail staff. Melynda has sought medical treatment since her release from the jail.

During her detention, another female detainee began to show signs of illness, but though my client and others pleaded with guards to help this woman, the staff refused. This female detainee had a series of ███████ that day causing my client to experience great anxiety for her own health condition. After several ███████ an ambulance came for her fellow detainee and took her to Ray County Hospital. She feared she could die in that cell from her own lack of medical care brought on by the failure to take her medication. Her fears were not only for herself, but for other female detainees. She witnessed first-hand that they were on their own because no jail personnel were going to help them if the worst happened creating a dangerous and unsafe environment.

While my client is petite, at a height of 5 feet, 1 inch, and approximately 120 pounds when she went into the Ray County Detention Center, she lost *twelve pounds* during her 6-day incarceration. The conditions were so severe that she continued to lose weight. The other female detainees encouraged her to save some of their food in case jail staff did not serve a meal – because meals were sometimes skipped by jail staff.


IV. **Scalding Water**

During her period of confinement, Melynda used the showers within the G-pod. My client explained, without warnings, the temperatures of the water in the shower would instantly become scalding hot. The water would become scalding without adjusting the temperature manually. The water temperature was so severe that my client's hand and upper arm was burned by the water. The burns left her skin swollen, red and inflamed, but she received no medical assistance from jail staff.

V. **Black mold & Sanitation Issues**

Black mold was prevalent inside the G-pod throughout the cinder block walls, but most prevalent in the showers. While the showers were dangerous from the unsuspecting scalding water, the smell from the mold made it impossible to avoid. She had no choice but to inhale the toxin and believes she developed a rash from the exposure. The mold was not cleaned while Melynda was in custody.

Two of the toilets never worked and a third only occasionally worked. That left a single toilet for each of the women to use. The toilets that were in disrepair were not cleaned and some overflowed. The sanitation issues in this pod were impossible to escape though the detainees tried to clean their

pod, usually without supplies. From the black mold, sewage, dirty food trays that was not removed by guards, rotting food stuck to the walls right outside of their pod, and sweating concrete floors, there was literally nowhere to escape the biohazards inside the G-pod.

## VI. Roof Leaks

The roof over the G-pod leaked during a bad storm during her confinement. Water came in through the front area of the pod by the table where they ate meals. Jail staff would not address the water in their pod, including even coming back to assess the leak, so the women detainees used their sheets from their beds and some unused bunks to soak up the water. They eventually received a mop bucket to clean up the mess left by the leak in the roof.

## VII. Dangerous Conditions

The conditions posed additional dangers to my client and others. While the AC system was inoperable, a door to the outside of the jail near the women's pod was left open. My client could see through this door to a maintenance shed and the side of the jail. This door to the outside world was left open and jail doors with bars held together with a pair of handcuffs were utilized to keep detainees from leaving. The handcuffs served as a makeshift lock, because the locking mechanism to the jail door was broken. While this outside door was open, the detainees were exposed to the elements, rodents, spiders, mosquitos, and contraband coming into the jail.

## VIII. Violations of Equal Protection

### A. Inadequate staff response

Male detainees were given privileges that were never offered to women detainees, such as being trustees. Due to the staff members refusal to assist the women detainees, the women relied on the male detainees for assistance out of necessity, especially during medical emergencies. Even when jail staff would not respond to the men's pleas for help for the women, then men would pass messages to the guards requesting a cleaning cart so they could clean it themselves.

### B. Women's Clothing

Women detainees were treated significantly worse than their similarly-situated male detainee counterparts. The jail uniforms were one piece that buttoned up the front. However, the female uniforms had buttons missing around the breast and pelvis area. Staff removed women's bras and underwear upon intake, but provided no replacements, leaving the women's breasts and pelvis exposed. My client had no underwear or bra though she paid for those items from Commissary. She never received the items purchased and was left exposed. She was humiliated further as she went to Court in her exposed Ray County issued jumpsuit to address charges that were eventually reduced to a class B misdemeanor, the equivalent of a speeding ticket.

### C. Sanitary Napkins and Tampons

The women were degraded further with a denial of feminine hygiene products. Unable to control the timing of biological functions, the women bled on themselves during menstruation cycles because they had no other options. Further, they bled on their makeshift sanitary napkins from

clothing left behind by former female detainees. On the rare occasion that women received sanitary pads, they were not provided with underwear in order to use them. Adding to the degradation of her confinement, her menstruation began while she was in Ray County leaving her to bleed on herself.

### D. Recreation: Outside Movement and Trustee Privilege

Jail policy stated: "Recreational Time will be attempted to be offered in the exercise area 1 time per week, weather permitting, if there is sufficient Facility Staff on duty, and privileges have not been taken away." When my client was in your jail, she and the other women detainees were never permitted to go outside in the recreational yard. Whereas the male detainees were permitted to be trustees and freely move around the jail – inside and outside—including to the "exercise area." Women were not permitted to be trustees. Jail staff clearly applied the policy disparately between the men and women.

### E. Recreation: reading materials and electronics

Per jail policy, men were allowed to have "1 soft bible, and 2 soft bound books" which could be "exchanged at book cart time." They were also allowed, "1 pair of eyeglasses, 1 writing tablet, [and] anything bought off commissary." Per jail policy, women were not allowed to have any of those items in their pod. The women had no books, no working television and at times a shared tablet for all women to share. They could hear the men's television but could not see it. They were given a deck of playing cards to pass the time.

### F. Basic Necessity: Working A/C

As previously discussed, women had no working A/C in their pod; the men did.

## IX.    Demand

Melynda demands ▮▮▮▮▮▮ to resolve all claims against the Ray County Commission, and the individuals named in this demand letter. This demand will expire on August 29, 2025.


Sincerely,


*/s/ Jean Peters Baker*

6

# JEAN PETERS BAKER

## Attorney at Law

4050 Pennsylvania
Kansas City, Missouri 64111
jean@petersbakerlaw.com
816-730-4043

Sent via email to Steve Coronado, counsel for the Ray County Commission, at
scoronado@fpsslaw.com on August 11, 2025.

August 11, 2025

Ray County Commission
Heather Maulsby, Ray County Clerk
100 W. Main Street
Richmond, Missouri 64085

RE:     Demand on behalf of my client, April Rose Ricketson, former Ray County Jail Detainee

Dear Commission:

I represent April Ricketson in her 42 U.S.C. § 1983 8th Amendment conditions of confinement and 14th Amendment equal protection claims against the Ray County Commission and in their individual capacities, Ray County, Missouri jail staff Bob Swindler, Tony (last name believed to be Lamar), Evan Bates, Sky Glenn, Melanie Pumphrey, and former Sheriff Scott Childers. She was incarcerated at the Ray County jail from November 17, 2023 to December 18, 2023 (31 days) and May 24, 2024 to July 17, 2024 (54 days), as a post-conviction detainee. She was incarcerated for a total of 85 days in your jail.

## I.      Ray County Commission knew of the dangerous conditions inside their jail since the summer of 2021, but deliberately chose to do nothing.

To begin, let me be very clear, in my former career, directly and indirectly, I was exposed to many poor jail conditions, but I can honestly tell you, I have never seen such inhumanely cruel conditions as those in your jail. The women who found themselves in your jail were singled out for the worst conditions, creating not just an exceedingly unbearable environment to endure, but a dangerous one. There is no question you knew about these inhumane, and often times, life-threatening, jail conditions, and yet, you completely disregarded them. Ray County's explicit disregard for the lives of female detainees is particularly disturbing. I believe any federal judge in the Western District of Missouri will agree with that assessment after hearing the facts in these cases.

I will remind you of what you and I already know: Sheriff Childers, who ran the day-to-day operations of the jail, requested of you, to hire HMN Architects in the summer of 2021 to do a review of the jail. You agreed. Although absent from your meeting minutes, I believe you also approved the employ of Septagon Construction to do a review of the jail.

1

After conducting their review, Septagon and HMN reported numerous problematic issues to you and Childers, but there was one singularly reported issue that stands out as life-threatening in nature: **the jail was a furnace oven during the blistering Missouri summers. You have known this since, at least, the summer of 2021; however, there is evidence that you knew before this date.** I am aware that former Carrollton, Missouri Police Chief Robert (Bobby) Turner stopped housing his inmates in your jail due to the poor conditions sometime during his tenure (2013 to October 2019). I expect to learn there were other police chiefs who felt the same. Regardless, you were certainly aware in the summer of 2021.

On July 9, 2021, after conducting a site visit of your jail, HMN was so alarmed at its conditions, that they sought the opinion of Jordan Bartholomew, an electrical engineer. Mr. Bartholomew opined about your jail: there is "likely not enough (or none at all) conditioned outdoor air being delivered and what exhausts they do have for the jail is sucking in the raw outside air through gaps in the construction." Mr. Bartholomew's opinions were shared with you in July 2021.

On July 14, 2021, in its report, HMN warned you that "[t]he mechanical systems in the facility appear to be residential forced air units with air distributed in the attic with both sheet metal duct and flex duct. It is an inefficient method and not code compliant for the occupancy."

On July 23, 2021, Septagon warned you of the same in its report and noted that the jail had a "sheet metal roof" and "sheet metal screwed to the trusses for a ceiling."

On July 30, 2021, HMN Architect Shawn Harding called your jail "a death trap" and "a wood-fired pizza oven". He also said the jail failed fire safety and American Correctional Association guidelines. (*See* Richmond Daily News, "Politics Aside, Ray County needs a new jail," published online July 30, 2021).

One does not need to be an architect or an electrical engineer to understand those warnings. It was clear in the summer of 2021 that the residential AC units in the jail were sized for homes and could not possibly provide the necessary cooling power to handle the larger volume of air and increased heat load in a commercially sized building, like your jail. Moreover, the sheet metal roof and ceiling acted as thermal conductors—transferring heat from the outside into the jail during the hot summer months—turning the jail into a hot, "wood-fired pizza oven."

But unfortunately, it does not stop there. The women detainees reportedly had no working AC unit inside their G-pod, instead they relied on the unpredictably sullen nature of which corrections officer was on duty. The only AC the women detainees received was through their cell door, propped open to capture some of the spillover AC from the men's general population cell. However, in the blink of an eye, a corrections officer would slam that door shut, in an attempt to mete out punishment, sealing the women detainees inside their G-pod with no air flow. **April recalls this being done frequently in retaliation for the women's complaints of the heat or other issues.**

And your response to the life-threatening issue that you were fully aware? Nothing. Instead, you and Childers allowed your antagonistic relationship with each other to override the safety of the lives of the women (and men) trapped in your jail. Childers said as much in a June 16, 2021

Facebook video posted by him on the Ray County, Missouri, Sheriff's Office Facebook page. He said that he had been misled by you into believing that some of the $6M covid funds would be available to help with the jail; instead, he learned that none of those funds would be used to help with the jail. I look forward to discovering your priorities for the covid funds; for example, I know that you spent approximately $150K on a John Deere tractor in 2020, that you failed to inform the public, and as a result, admitted to violating Missouri's Sunshine Law. (*See State of Missouri v. Ray County, Missouri;* 21RY-CV00228). According to your admissions in this lawsuit, you spent $2.7M of covid funds in May 2020, without first providing notice to the public in violation of Missouri's Sunshine Law. I expect to discover your priorities with the use of the Covid and other funds, particularly upon learning of the life-threatening conditions inside your jail.

In addition, on October 27, 2021, after Childers gave a tour of your jail to Fox 4 KC, Commissioner Bob King released the following cryptic statement: "**We know [the jail is] not safe**. We're trying to figure out what we can do to help [Sheriff Scott Childers]. We're willing to work with him any time he wants to work with us. We want the best for Ray County that we can get." (*See* https://fox4kc.com/video/conditions-worsening-at-ray-county-missouri-jail-sheriff-says/7099714).

It is unclear exactly what Commissioner King meant when he stated: the Commission is willing to work with Childers "any time he wants to work with us." I suspect, and certainly discovery in a lawsuit will reveal the answer, the acrimony between the Commission and Childers was related to the Commission's denial of funding for (1) sunlight barrier tunnels; (2) air purifiers; (3) dehumidifiers; and (4) an industrial washer and dryer—all requested by Childers from you at the August 31, 2024 Ray County Commission meeting. As you know, because Childers explained to you, these items were necessary to help reduce mold and mildew, which was rampant inside your jail, and to help make your jail somewhat more code compliant (that it was not) under the American Correctional Association guidelines.

As a result of your deliberate indifference, the women detainees in your jail in the summer of 2024, including my clients April Ricketson, Misty Silkwood, Debbie Rush, Tammara Utley, Shelby Brannum, Tabitha Spicer, and Natosha (Romano) Chambers experienced the most draconian of punishments: tortuous heat for days and weeks at a time.

## II.     Summer of 2024: Tortuous Heat in the G-pod

What is foremost etched in April's mind about her experience in your jail is the brutal and tortuous heat of the summer of 2024. Soon after April first arrived at your jail on May 24, 2024, the temperature inside G-pod began to soar to unbearable levels.

As you know, your jail was essentially a large metal shed. (*See* "Whose county is Ray County? Yours," editorial piece in June 2021 in The Excelsior Springs Standard, describing your jail as a "large metal shed that is falling into disrepair, despite years of patching to hold the place together."). This type of structure made your jail conducive to soaring heat levels—couple that with no working AC in the women's G-pod, and none of what my clients have shared with me about the summer of 2024 will surprise any judge or jury.

The women detainees, including my client, April, repeatedly requested relief from the scorching temperatures. They were ignored, mocked, and worse, they suffered retaliation for making such requests.

They requested ice, but jail staff arbitrarily denied providing ice to the women, because according to the staff, it could be used as a weapon. Yet, the women were allowed sharpened pencils inside the G-pod. The women detainees, including April, took turns taking cold showers to stay cool. They also let the cold showers run in an attempt to lower the temperature inside the G-pod. But they were warned by staff to stop wasting water or their water would be shut off.

The women detainees only had their hot orange jail uniforms to wear. April, along with other female detainees, would strip down naked and lay on the concrete floor in attempt to keep from overheating. April recalls the concrete floors always being wet as if the floors were "sweating." In response, jail staff warned the women to put their uniforms on or get punished with conduct violations.

After the women detainees had made several complaints about the heat, April recalls a male staff member coming back to the G-pod wearing a hooded sweatshirt and making a "bbbrrrr" sound while pretending to shiver. His message to the women detainees was clear: if you continue to complain about the heat, you will continue to suffer, while guards enjoyed the cool temperatures afforded by AC.

The women detainees would wave to the cameras inside the G-pod to get the attention of staff in the hopes that a staff member would respond to their cell and help them with the unbearable heat. As you know, the G-pod was in the very back of the jail. The women were ignored. In a desperate attempt to get help, the women would cover the cameras in the G-pod with an article of clothing, because they knew if the cameras were covered, a staff member would likely respond to their cell. However, when a staff member so responded, instead of helping the women, staff often punished them: by taking away their phone privileges or in an act of great cruelty, shutting the door to their G-pod - shutting off their only access to any air circulation provided by the AC in the men's pod. The women had no working AC in the G-pod.

On **July 8, 2024**, April pled guilty to her charges, because that was the only way she saw as getting relief from the extreme heat. She believed she may die inside your jail and was desperate to find any way out to simply survive. She remained in your jail awaiting sentencing.

On **July 11, 2024**, Undersheriff Steve Mendoza told you at a **July 11, 2024** Commissioner's meeting that the women detainees needed a new AC unit for the women's pod **ASAP.** That did not happen. Instead, on **July 14, 2024**, detainee Natosha Chambers began suffering ███████ from the extreme heat. For hours as she lie on the floor, the women detainees screamed for help. No help came. The women detainees sent messages to outside family and friends, requesting they call 911. Finally, at around 5:30 p.m., an ambulance showed up for Natosha; and the other women detainees, including April, were removed from the jail on an emergency basis, and taken to Caldwell County jail. On July 17, 2024, April was released to the custody of the Missouri Department of Corrections from the Caldwell County jail. She has not returned to your jail since.

4

April suffered tremendously as a result of the extreme heat in your jail: she sweat profusely, found it hard to breathe, and suffered great anxiety, believing she would die in the heat.

### III.   Unbearably cold temperatures in the G-pod during the winter months.

During her stay at your jail in November and December 2023, April recalls the G-pod being so cold that the women detainees, including April, would stay in their beds all day under their covers, just trying to stay warm. They also would run the hot showers to create heat from the steam—that only helped somewhat, and jail staff almost always threatened to shut off the women's water if they continued to run the hot showers. The women would also remove their mattresses from their beds, place them on the floor near the door of the G-pod, to be near the spillover heat that flowed into their pod from the jail. They also huddled together to create warmth from each other's body heat. April was unable to sleep due to the constant cold conditions inside the G-pod.

### IV.   Medical requests were ignored for days and weeks at a time.

April developed a ███ all over her body while inside your jail. The ███ consisted of ███ that oozed, itched, and burned when she showered. For weeks, she complained constantly, requesting relief. Finally, two days before the women detainees were sent to the Caldwell County jail, the mental health staff member brought her some Zyrtec, which provided some relief.

April had a prescription for meds for her ████ She only got those meds on occasion. This unpredictable med schedule caused April's ████ to increase.

In late June 2024, April got into a fight with Tammara Utley, another detainee. As a result, April suffered a gash in her forehead which required stitches from a doctor at the Ray County Hospital. Her stitches were supposed to removed in 7 days; but staff delayed in getting her medical help to remove the stitches, until nearly 28 days later. As a result, she suffered a great deal of pain as the stitches, which had grown into her hairline, were removed.

### V.   Black mold

April recalls there was an extreme amount of black mold inside the G-pod. The stench from the mold made it very difficult to breathe. There was nowhere to go inside the G-pod to escape the stench. The worst of the black mold was in the showers and under the sink where the women would get drinking water and wash their own linens because cleaning and laundry were not provided on a regular basis and certainly not on the weekly basis determined under Ray County standards.

### VI.   Violations of Equal Protection

April recalls how much better the male detainees were treated than the women detainees. Male detainees were given privileges that were never offered to women detainees, such as being trustees, which often permitted them to roam around the jail unsupervised. Due to the staff members refusal to assist the women detainees, the women relied on the male detainees for assistance out of necessity. April recalls that it was important to "stay on the good side of the men [detainees], because they were our only source to get help and the only way to communicate with the guards,

because the guards ignored us." By way of example, April recalls when there was a sewage backup in the G-pod, and the women detainees were not able to get staff back to their pod to assist. The women detainees relied on the male detainees who conveyed the message to staff for help. Even when jail staff would not respond to the men's pleas for help for the women, then men would pass messages to the guards requesting a cleaning cart so they could clean it themselves. Most importantly, the women relied on the men to convey messages for medical help for them. This was one of her biggest concerns, that a women would die in that G tank.

A. <u>Inadequate staff response</u>

Unlike the men's pod, the women's pod and the ad seg cell used for the women were at the very back end of the jail, and although there was a video surveillance camera in the women's pod, staff rarely conducted cell checks of the women's pod. For the women detainees, including April, it was nearly impossible to request emergency assistance from staff. The women's screams for help went unheard, as was the case with the female detainee (Nicole Wilms) who had a ▓▓▓▓▓▓▓▓ in 2024, the female detainee (Natosha Romano Chambers) who had a heat-induced ▓▓▓▓ in 2024, and the female detainee (Tammara Utley) who became unconscious due to the extreme heat in 2024. With no cell checks and no assistance button to alert staff, women, including April, desperately attempted to request help from staff by waving at the surveillance camera and mouthing the word, "help," and covering the camera with articles of clothing in a desperate attempt to get staff assistance. Other women detainees recalled spelling out the word, "help" with playing cards on the table and floor of the women's pod—hoping staff would see it on the surveillance camera and respond. But staff rarely responded—or if they did, their response was inadequately delayed. This was intolerable, and resulted in an insufferable indignity to the women detainees, including my client, and created a condition that constituted a serious hazard to the women's health and safety.

B. <u>Women's Clothing</u>

Women detainees were treated significantly worse than their similarly-situated male detainee counterparts. To start, the jail uniforms were one piece that buttoned up the front. However, the female uniforms always had buttons missing around the breast and crotch area. They complained about the uniforms, asking for uniforms that covered their private areas, but nothing was done. Furthermore, staff removed women's bras and underwear upon intake, but provided no replacements, leaving the women's breasts and crotch exposed in their jail uniforms.

With no bra and underwear, a jail uniform with missing buttons in the breast and crotch areas, caused the women to be constantly vigilant of how they moved around in the jail so as to not expose their breasts or crotch areas any more than they already were. However, during the greatest extremes of temperature, in desperation the women removed the heavy uniforms and sat in their improvised undergarments. Often, male staff would admonish the women for being in stages of undress and threaten them with additional charges of indecent exposure while they simply tried to regulate their body temperatures.

Women detainees were forced to improvise for undergarments. They often made make-shift "bras" and "underwear" from clothing left behind by women detainees who had been released from jail.

These women, having experienced the same, intentionally left some of their clothing behind for the remaining women to use as "bras" and "underwear."

C. Sanitary Napkins and Tampons

The women were degraded further from a denial of feminine hygiene products. Unable to control the timing of biological functions, the women bled on themselves during menstruation cycles because they had no other options. Further, they bled on their makeshift sanitary napkins from clothing left behind by former female detainees. On the rare occasion that women received sanitary menstruation pads, they were not also provided with underwear. One guard told the women to "tape the pad to their leg" and to stop complaining.

D. Recreation: Outside Movement and Trustee Privilege

Jail policy stated: "Recreational Time will be attempted to be offered in the exercise area 1 time per week, weather permitting, if there is sufficient Facility Staff on duty, and privileges have not been taken away." When my client was in your jail, she and the other women detainees were never permitted to go outside in the recreational yard. Ever. Whereas the male detainees were permitted to be trustees and freely move around the jail – inside and outside—including to the "exercise area." Women were not permitted to be trustees. Jail staff clearly applied the policy disparately between the men and women. The only time April saw the outdoors was in transport to a court appearance in over 80 days in your jail.

E. Recreation: reading materials

Per jail policy, men were allowed to have "1 soft bible, and 2 soft bound books" which could be "exchanged at book cart time." They were also allowed, "1 pair of eyeglasses, 1 writing tablet, [and] anything bought off commissary." Per jail policy, women were not allowed to have any of those items in their pod.

F. Recreation: Netflix and Youtube

Men detainees were given access to Netflix on the T.V. in their pod; the women detainees did not have this privilege. April recalls that men detainees had also had access to Youtube; the women did not. The men would sometimes ask the women if they had a song request, and they might play it for them.

G. Basic Necessity: Working A/C

As previously discussed, women had no working A/C in their pod; the men did. That is no more evident than what occurred in mid-July 2024 wherein a female detainee (Natosha Chambers) had a heat-induced seizure, and jail staff, with the Commission's blessing, made the decision to move the women detainees from the Ray County jail to the Caldwell County jail on an emergency basis, due the dangerous heat conditions in the women's pod. My client remembers the immediate relief of the outside air and then the transport van's air conditioning in the ride to Caldwell County.

7

H. <u>Basic Necessity: Food</u>

Men detainees who were trustees or worked special projects in and outside of the jail were given special food privileges. April recalls one night when staff did not timely feed the women detainees their evening meal, because the staff was busy doling out pizza to some men detainees. After their pizza party concluded, the staff fed the women detainees (and it was not leftover pizza).

**VII.    Demand**

April demands ███████ to resolve all claims against the Ray County Commission, and the individuals named in this demand letter. This demand will expire on August 29, 2025.

Sincerely,

*/s/ Jean Peters Baker*

# Jean Peters Baker
### Attorney at Law
4050 Pennsylvania
Kansas City, Missouri 64111
jean@petersbakerlaw.com
816-730-4043

Sent via email at raycountycommissioners@commission.raycountymo.gov and ray@sos.mo.gov; also sent to by U.S. mail to 100 W. Main Street, Richmond, Missouri 64085.

July 3, 2025

Ray County Commission
Heather Maulsby, Ray County Clerk
100 W. Main Street
Richmond, Missouri 64085

RE:     demand on behalf of my client, Deborah Rush, former Ray County jail detainee

Dear Commission:

I represent Deborah Rush in her 42 U.S.C. § 1983 PREA, 14th Amendment conditions of confinement, and 14th Amendment equal protection claims against the Ray County Commission, and in their individual capacities, Ray County, Missouri jail staff Bob Swindler, Tony (last name believed to be Lamar), Evan Bates, Sky Glenn, Melanie Pumphrey, and former Sheriff Scott Childers. She was incarcerated at the Ray County jail from January through July 2024, as a pretrial detainee. While incarcerated at the Ray County jail, she experienced the following:

I.     <u>Prolonged exposure to unsanitary conditions</u>

A. <u>Raw Sewage</u>

In the women's pod, there were 4 toilets. It was well-known to jail staff that one of those toilets overflowed on a weekly basis, and another would not flush. When the toilet overflowed, raw sewage overflowed on the floor, which was a combination of one or more the following: fecal matter (at times in the form of diarrhea from a detoxing detainee), urine, dirty toilet water, used toilet paper, vomit, and menstrual blood.  Almost always, the raw sewage, deep enough to seep into my client's and other women's shoes, remained on the floor until it evaporated. The toilet that would not flush, held stagnate sewage of fecal matter, urine, vomit and menstrual blood on a constant basis for the entire time my client was in the jail. My client, and the other women detainees, had no choice but to constantly stand in, and to breathe in, the contaminants from the raw sewage, which exposed them to disease and illness.

Their pod, as you know, was small, and had no windows and no ventilation, making the stench unbearable. In warmer months, gnats swarmed over the raw sewage on the floor and in the toilets

1

inside of the women's confinement area. This occurred the entire time, approximately 179 days, my client was incarcerated in Ray County jail in 2024.

My client and other women detainees repeatedly complained about the raw sewage to jail staff—requesting that staff clean it or that staff give them cleaning supplies so they could clean it themselves. In response to those complaints, staff retaliated against my client and the other women by (1) refusing to clean the sewage up from the floor, (2) refusing to give my client and the other women cleaning supplies so they could clean it up themselves, (3) removing any "make shift" cleaning supplies (made from clothing released women detainees left behind) my client and other women used to clean up the sewage, (4) refusing to repair the toilet, and (5) purposefully shutting the only door connecting the women's pod with the rest of the jail, intentionally forcing my client and the other women to breathe in the toxic fumes from the sewage for the sole purpose of punishing them for complaining about intolerable conditions.

For example, my client, and the other women, repeatedly complained to Bob Swindler, who worked for the jail, about the sewage. Mr. Swindler's response: "You made the mess. You clean it up." But Mr. Swindler intentionally refused to give my client, or the other woman, any cleaning supplies so they could clean up the sewage. My client, along with other female detainees, made their own cleaning supplies with pieces of clothing intentionally left behind by other women detainees who were released from the jail, to use as make-shift cleaning supplies. My client and the other women knew they had to hide their make-shift cleaning supplies, or it would be removed by jail staff for no other reason than to punish these women. Female detainees hid cleaning supplies in a shampoo bottle, when they could, so it would not be taken away from them. However, as you can imagine, those make-shift cleaning supplies, few and far between as they were, soon became grotesquely contaminated from cleaning sewage (and also black mold, which will be addressed later in this demand letter).

Another example: after repeatedly complaining with no response from staff, my client attempted to clean up the sewage with a bucket inside the women's pod, as best she could, by scooping up the sewage and throwing it into the hallway. When staff discovered she was doing this, they took the bucket away from her, shut the door to the women's pod, and knowingly sealed my client and the other women in the women's pod with no ventilation, intentionally forcing them to breathe in the sewage fumes.

At one point, in an act of desperation, my client took breakfast cereal boxes, expired by months and given to the women to eat, as "stepping stones" on the sewage-covered floor, so she and the other women could step on those cereal boxes and avoid getting raw sewage in their shoes. When the jail staff discovered these "stepping stones," they were immediately removed from the women and the sewage remained.

After months of being exposed to sewage, in May/June 2024, my client suffered from a bacterial infection, which she believes was caused by her use of a shared bath towel that was exposed to the raw sewage. My client experienced extreme ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ The women detainees, including my client, were only given 2 or 3 bath towels to use (for 8 to 10 women detainees); and those bath towels were only washed once per week. My client

2

requested medical assistance for the infection, repeatedly, but that was never provided. She simply suffered from the symptoms until she left the facility.

## B. Menstrual Blood and Hepatitis C

In addition to raw sewage, my client and other women detainees were exposed to their own and other women's menstrual blood on the floor, on the beds, in the shower, on the toilets, and on their uniforms. My client was never given any menstruation pads or tampons, even though she requested those necessary items. Jail staff did laundry one time per week; my client had to sit in her own menstrual-blood-soaked uniform for days, with blood running down her legs and onto the floor, shower, and bed. Moreover, my client was exposed to a female detainee who had ▇▇▇ which was known to the jail staff. As you know, ▇▇▇▇▇▇▇ is very contagious and is primarily transmitted through contact with infected blood, such as sharing bath towels, that the women detainees, including my client, were forced to do with the female detainee who had ▇▇▇ As is commonly known, ▇▇▇ can be transmitted through dried blood, because the virus can survive on surfaces in dried blood for a period of time and remain infectious—such as on towels, toilets, bed linen, etc. There was absolutely no legitimate governmental purpose for not providing the female detainee with HCV with her own bath towel or providing the women detainees with cleaning supplies "on scheduled basis" as the policy dictated—to clean up menstrual blood.

## C. Blood and Blood Clots from a Miscarriage

In addition to the raw sewage and menstrual blood, on one occasion, a female detainee had a miscarriage inside the women's pod, after repeatedly telling staff in the preceding days, she was having pregnancy complications. She bled all over the women's pod, leaving not only large amounts of blood, but also blood clots, on her bed and the floor, before making it to the toilet where she miscarried her fetus. She bled all over the toilet. My client and other women detainees were awakened, and screamed for help, and waved at the video surveillance camera signaling an emergency request for aid, but no staff responded. This female detainee continued to bleed, getting blood on my client and other women detainees as they assisted her. Staff eventually responded, and the detainee was taken to the hospital. My client and other women detainees asked for cleaning supplies to clean up the mess, but were not given any; instead, they used their make shift cleaning rags.

## D. Rotting Food

The male detainees threw their food out of their pod and into the jail hallway on the floor and against the wall. No one ever cleaned up this food. This hallway had a large amount of foot-traffic; my client had to walk through this hallway. The food stuck to the floor and walls and rotted and decayed over a period of months. The male detainees would throw more food in hallway floor and walls over top of the rotting and decaying food, this cycle continued for the entire time my client was at your jail. The decaying food attracted flies and other insects. As you know, bacteria and mold from decaying food can contaminate surfaces and be inhaled, leading to illness. Staff's refusal to (1) clean up the rotting food or (2) make the male detainees clean up their rotting food exposed my client to illness, when she had no other choice but to walk through the hallway.

### E. Black Mold

There was a proliferation of black mold in the women's showers and in their pod, caused by the jail's lack of ventilation and inadequate sanitation. The smell of mold was ever present, and worsened with heat, like that of an old wet basement. My client smelled mold the entire time she was at your jail, and in the sweltering heat in the summer months, the mold made it difficult for her to breathe, which she reported to staff. She and the other women detainees frequently complained about the black mold, but to no avail. My client and other women detainees asked frequently that staff either clean the mold or give them the supplies to clean the mold, but staff refused. My client and the other women used their make shift cleaning supplies to clean the mold—frequently, but because they did not have the proper cleaning supplies, their efforts were fruitless.

### F. Fumigation Risks

On occasion, the women's pod was fumigated to kill insects and other pests. A hired contractor fumigated the women's pod, with the women remaining in the pod. The women, including my client, were never given masks or any other protective gear, and the chemicals burned my clients' eyes and lungs, causing her to cough and her eyes to water, as it did with many of the other women detainees. Of course you and your jail staff knew, as anyone would know, that chemicals used in fumigation, like sulfuryl fluoride, are highly toxic to humans.

## II.   A Death Trap

In July 2021, Architect Shawn Harding, hired by the Ray County Commission to examine the jail and identify problematic issues, described to the Commission fundamental, life-threatening flaws in the jail—requiring immediate and urgent attention. Harding reported, "[b]y code, I couldn't house anybody in [the jail] right now." "Wood framing is flammable. You've got people housed in there that aren't free to exit. It's a death trap. I had an old sheriff one time call [a similar jail] a wood-fired pizza oven." Harding additionally reported that the jail had no adequately functioning sprinkler system. Harding described a jail structure that was unable to contain fire within any room. Moreover, as the Commission and jail staff knew, the jail had only one unlocked fire exit which was not easily accessible from the women's pod, had no properly functioning fire alarm system, smoke or heat detectors, or fire extinguishers, and had nothing in jail policy about any emergency plan in the event a fire broke out inside the jail.
Jail staff were allowed to smoke inside the jail. They frequently smoked e-cigarettes inside the jail. E-cigarettes, which use lithium-ion batteries, which are known for their flammability, can overheat and explode, causing fire; and, improper disposal of these batteries can also lead to fires.

These life-threatening conditions were known to the Commission and jail staff for years, but such was deliberately ignored up to January 2025, placing my client at risk of death for her entire stint at the jail.

## III.   Extreme Temperatures

### A. Extreme Cold

My client was housed in your jail through the most extreme temperatures: hot and cold. As you know, the women's pod was a small shed-like structure made of pressed tin or metal. In the winter, the women's pod became freezing cold. My client and the other women frequently complained about the freezing cold temperatures. Instead of helping these women, jail staff retaliated against them, including my client, for complaining.

When my client and other women complained "too much" about the freezing cold temperature, jail staff would remove some of their blankets in retaliation for complaining. Women, including my client, huddled together at night, desperately trying to stay warm by each other's body heat.

To stay warm, my client and other women frequently ran the hot water from the shower to create warm steam, which provided some warmth. As soon as jail staff became aware of the running shower, they immediately shut off the water. When the women, including my client, explained that they were simply trying to stay warm, jail staff would threaten the women detainees, including my client, with discipline if they continued to run the hot water from the shower.

My client suffered tremendously from the freezing cold temperatures. Her body shivered, and her fingers, hands, and feet tingled with pain, as she tried, but could not sleep. Her nose and lungs burned from breathing the frigid air in the women's pod.

My client became violently ill during January/February 2024 at the Ray County jail. She experienced a prolonged high fever and serious respiratory symptoms for 2-3 weeks. She believes the continuously freezing cold temperatures (and breathing in the toxic fumes from the black mold and sewage) in the women's pod lowered her immune system and made her more susceptible to illness. She requested medical intervention from staff but was refused.

B. Extreme Heat

Likewise, in the early summer months of 2024, prior to my client's departure from your jail, she and other women detainees suffered from dangerously high temperatures in the women's pod. My client and other women constantly complained about the unbearable heat, but they were met with only staff retaliation.

At times, the women had a fan that provided some small relief and much needed ventilation; however, after the women, including my client, complained about the heat, staff removed their fan, because the women were complaining too much. This happened on more than one occasion.

To combat the stifling heat, a door adjoining the men's pod with the women's had to be left open. The women's pod had no A/C, and the women had to rely on the overflow A/C from the men's pod; therefore, leaving the adjoining door open was the women's only source of air conditioning and ventilation. However, this simple request to leave the door open was a constant source of reprisal for the women even during the dangerous heat.

On more than one occasion, after the women detainees, including my client, had repeatedly complained about the heat, Tony (last name believed to be Lamar), who worked in the jail, slammed the door shut to the women's pod, cutting off any ventilation, and sealing the women

detainees inside a "wood fired pizza oven." With no working A/C in the women's pod, the only A/C the women got, was the spillover from the A/C in the men's pod. But that spill over air flow required the door to the women's pod to remain open. Tony knew this. He intentionally shut the door to punish the women, including my client, and in doing so, he put their lives at great risk of heat exhaustion, heat stroke, and seizures trigged by the heat.

In addition, to combat the extreme heat, the women, including my client, would lay on the concrete floor to help regulate their temperatures, the same floor that was often caked with sewage. The staff, observing the women on the contaminated floor, did nothing to protect them.

Adding to the extreme heat in the women detainees' pod was an open hole in the ceiling where a light fixture used to be. Hot air from the attic flowed into the women's pod through this hole. The women detainees, including my client, repeated asked that the hole be patched up, but staff refused. The women were once again left to their devices. They used paper from notebooks they were given, and "glued" the paper over the hole with toothpaste, to keep the hot air from flowing into their pod. As soon as the paper was discovered by staff, it was immediately ripped down. There was absolutely no legitimate governmental purpose for ripping down the paper. As was known to you and your staff as early as July 2021, in the attic of the jail, there were plastic water lines, and in the summer, it got so hot in the attic, that the binding glue of those water lines would melt. Thus, even if there was some legitimate governmental purpose in ripping the paper from the ceiling hole, which there was not, that governmental purpose was not proportional to placing the lives of women detainees, including my client, at great risk from the extreme heat.

Moreover, as you are aware, a female detainee suffered a heat-induced seizure and another female detainee suffered an early onset acute heat stroke in July 2024. Both women were hospitalized. My client had just left the jail days prior to those events, but she experienced the same extreme heat as those women detainees.

Women, including my client, frequently ran the cold water in the shower to keep from overheating; but when staff discovered they were running the cold water, staff shut the water off, and threatened the women, including my client, with discipline if they continued to run the cold water.

My client sweat profusely due to the extreme heat; she'd sweat through her uniform; her hair at the base of her neck would be drenched in sweat. My client was unable to sleep due to the stifling heat. The women, including my client, would remove their jail uniforms, and remain in the nude in their pod, just to get some relief from the extreme heat. Staff, instead of providing some lighter clothing, threatened the women, including my client, with discipline if they did not wear their hot polyester jail uniforms.

When the women complained "too much," about the heat or the cold, jail staff member Tony Lamar, would become infuriated, and would enter the women's pod, and throw their items around, including ripping the blankets and sheets off their beds, and throwing their notebooks and other items up against the wall. My client was afraid of him, as were other women.

Of course, the Commission has been aware of the dangerously extreme heat and cold in the jail, since at least July 2021, when its own architect Shawn Harding issued a report to the Commission,

6

calling the jail "a death trap" and "a wood-fired pizza oven," and advising that the residential A/C and furnace units used in the jail, were not meeting the basic jail requirements. As early as July 2021, the Commission knew the detainees were at substantial risk of harm from extreme heat-related conditions—because its architect reported this information to the Commissioners, and yet the Commission did nothing in response. And what the Commission could have prevented, but chose to consciously disregard, is what happened to my client: heat-induced panic attacks and suicidal ideation.

IV.     Extreme heat and suicidal ideation

In June 2024, my client was assaulted by another female detainee in the women's pod. My client requested to be moved to administrative segregation (ad seg or the hole) cell, for her own protection against the woman who assaulted her. The ad seg cell had no lights, no electricity, and no A/C. The chuckhole provided the only ventilation. The temperature inside the ad seg cell was so oppressively hot that my client struggled to breathe; my client hyperventilated as she struggled to breathe in the dark with no access to assistance or ventilation. She had an over-whelming ▮▮▮▮ that reoccurred for days because she received no assistance. She thought she was going to die. She had no way to contact jail staff, so she begged, cried and screamed and kept screaming for help. In response to my client's screams for help, jail staff member Sky Glenn slammed the chuckhole shut and shut a door outside the ad seg cell, cutting off her *only* ventilation, and essentially sealing her in a tomb—for no other purpose than to punish her for desperately screaming for help. My client had night terrors and became ▮▮▮▮ while in the hole. After screaming repeatedly that she wanted to kill herself, staff finally placed her in the suicide cell.

She remained in the suicide cell for three days but received no additional care. While in the suicide cell, she was essentially naked as the only provided clothing was an inflexible suicide smock that was several sizes too large for her – and it would not stay on, leaving her fully exposed.

V.     PREA and Violations of Equal Protection

A. Inadequate Staff Response

Unlike the men's pod, the women's pod and the ad seg cell used for the women were at the very back end of the jail, and although there was a video surveillance camera in the women's pod, staff rarely conducted cell checks of the women's pod. For the women detainees, including my client, it was nearly impossible to request emergency assistance from staff. The women's screams for help went unheard, as was the case with the female detainee who had a miscarriage in 2024, the female detainee who had a heat-induced seizure in 2024, the female detainee who became unconscious due to the extreme heat in 2024, and my client, who was violently ill in January/February 2024 and suffered from heat-induced panic attacks and suicidal ideation in June 2024. With no cell checks and no assistance button to alert staff, women, including my client, desperately attempted to request help from staff by waving at the surveillance camera and mouthing the word, "help," and spelling out the word, "help" with playing cards on the table and floor of the women's pod—hoping staff would see it on the surveillance camera and respond. But they rarely did—or if they did, their response was inadequately delayed. This was intolerable, and resulted in an insufferable

7

indignity to the women detainees, including my client, and created a condition which potentially constituted a serious hazard to the women's health and safety.

B. Women's Clothing

Women detainees, including my client, were treated significantly worse than their similarly-situated male detainee counterparts. To start, the jail uniforms were one piece that buttoned up the front. However, the female uniforms, including my client's, always had buttons missing around the breast and crotch area. They complained about the uniforms, asking for uniforms that covered their private areas, but nothing was done. Furthermore, staff removed women's bras and underwear upon intake, but provided no replacements, leaving the women's breasts and crotch exposed in their jail uniforms.

With no bra and a jail uniform with missing buttons in the breast area, women, including my client were constantly aware of how they moved around in the jail so as to not expose their breasts anymore than they already were. Often, male staff would admonish the women, including my client, to close her jail uniform, because "I can see your t***." My client and other women would ask: "how am I supposed to close my uniform?" Of course, the answer to that was obvious: they weren't supposed to.

Women detainees, including my client, often made make-shift "bras" and "underwear" from clothing left behind by women detainees who had been released from jail. These women, having experienced the same, intentionally left some of their clothing behind for the remaining women to use as "bras" and "underwear."

C. Inappropriate Sexual Overtures

On one occasion, staff member Evan Bates appeared at the women's pod door late into the night and asked my client to approach him at the pod door. It was dark inside the pod, and the other women were sleeping. Bates then exposed his penis to my client, and mumbled something that my client could not quite understand. My client quickly left the area near the door and went back to her bed.

Tony (last name believed to be Lamar) often ogled the women, including my client, when they were in states of undress.

Male detainees, who were trustees, were permitted to crawl into the attic space above the women's pod and peer into the women's pod through the hole in the ceiling where the light fixture used to be. The male detainees would peer at the women as they were in various states of undress.

D. Sanitary Napkins and Tampons

Women were denied access to feminine hygiene products and bled on themselves and made their make shift sanitary napkins from clothing left behind by former female detainees.

E. Recreation: Outside Movement and Trustee Privilege

Jail policy stated: "Recreational Time will be attempted to be offered in the exercise area 1 time per week, weather permitting, if there is sufficient Facility Staff on duty, and privileges have not been taken away." When my client was in your jail, she and the other women detainees were permitted to go outside in the recreational yard one time, and that single time was for the purpose of cleaning a car that belonged the Sheriff Childers' friend. Whereas the male detainees were permitted to be trustees and freely move around the jail – inside and outside—including to the "exercise area." Women were not permitted to be trustees; my client asked to be a trustee and do the laundry, but was denied and told that women were not allowed to be trustees. Jail staff clearly applied the policy disparately between the men and women.

F. Recreation: reading materials

Per jail policy, men were allowed to have "1 soft bible, and 2 soft bound books" which could be "exchanged at book cart time." They were also allowed, "1 pair of eyeglasses, 1 writing tablet, [and] anything bought off commissary." Per jail policy, women were not allowed to have any of those items in their pod.

G. Recreation: Netflix

Men detainees were given access to Netflix on the T.V. in their pod; the women detainees did not have this privilege.

H. Basic Necessity: Working A/C

As previously discussed, women had no working A/C in their pod; the men did. That is no more evident than what occurred in mid-July 2024 wherein a female detainee had a heat-induced seizure, and jail staff, with the Commission's blessing, made the decision to move the women detainees from the Ray County jail to the Caldwell County jail on an emergency basis, due the dangerous heat conditions in the women's pod. After a few days the women returned back to the Ray County jail, but soon thereafter, the extreme heat conditions returned.

I. Dogs

Some men detainees were allowed to bring their dogs into the jail; women were not given that privilege. On one particular occasion, some male trustees found a stray dog with pups and brought them back to the jail. The dog and pups were placed in the women's pod, and the women detainees, including my client, were expected to take care of the stray, potentially unsafe animals.

VI. Ray County Response to Conditions at the Jail:

The Ray County Commission has been aware of the foregoing conditions of the jail since at least 2021, because they were repeatedly provided such information from former Sheriff Childers, Under Sheriff Mendoza, their own architect expert, media news accounts—including a Fox 4 news crew with video footage from inside the jail and aired on its channel, complaints directly from

9

some detainees to commissioners individually, review and approval of medical and other billing arising out of the jail, and their own viewing of the jail.

The conditions of the jail were a regular source of information in Ray County. As you are aware, the currently elected Sheriff and the previous elected Sheriff of Ray County have made numerous statements regarding the conditions at the Ray County jail. Both officials and their designees have testified before the Commission numerous times regarding the conditions at the jail. Some staff quit working for the jail out of frustration regarding the conditions that went unaddressed.

Further, on or about October 26, 2021, Presiding Commissioner Bob King, speaking on behalf of the Ray County Commission, told news media, *"We know the jail is not safe. We're trying to figure out what we can do to help Sheriff Scott Childers. We're willing to work with him any time he wants work with us. We want the best for Ray County that we can get."* Dave Powell also served as the Eastern Commissioner at this time.

Commissioner Dave Powell reportedly toured the jail in September 2021, visited in 2024, and toured with the other 2 commissioners in 2024 at the request of the newly elected sheriff. Commissioner Powell was provided additional complaints from the women's pod about the extreme conditions throughout 2024, resulting in Commissioner Powell going to the jail on a surprise visit.

Some female detainees contacted concerned residents outside of the jail. Those residents would contact the jail about specific concerns, such as a request to open the door to the women's pod so that they could have airflow in the extreme heat. The staff reportedly stated, "no key could be located to open the door." Female detainees would also contact concerned residents to call for emergency services to the female's pod when another female became unresponsive, was bleeding profusely from a miscarriage or other serious medical events were occurring while jail staff ignored their pleas for help. The women would experience acts of retaliation by jail staff after these calls were received.

In 2021, the Commission and former Sheriff Childers recognized their own liability for placing the detainees at serious risk of injury and death, and identified some solutions:

- Industrial-sized dehumidifiers to help combat mold ;
- Reflective material for sunlight;
- UV bulbs to help combat the extremely poor air quality;
- Placing more detainees on ankle-monitoring;
- Housing detainees in mobile-site trailers.

But they deliberately chose to implement none of these solutions—that were available to them, albeit some were temporary fixes. In addition, in 2021, Architect Harding recommended a new jail and estimated a cost of $11.5M for an 80-bed capacity facility. No plan was ever made to construct a new jail to replace the jail that was a known "death trap"; instead the Commission "let the voters" decide, intentionally shirking their own responsibility to the detainees in their care and custody.

Most of the detainees, including my client, of the Ray County jail were there because they did not have the financial resources to pay bondsmen the necessary money to obtain their release. The only legitimate state purpose served by holding in jail those who are unable to make bond is to make certain that those detained are present when their cases are finally called for trial. Considering the life-threatening conditions of the jail, placing more detainees, such as my client, on ankle-monitoring, which cost the County $10.00, was an easy fix, but was rejected, because the County was able to make money off the detainees if they were housed in the jail.

Most shocking is that the Commission intentionally declined to the place more detainees on ankle-monitoring and house detainees in mobile-site trailers, because the county made money off the detainees from their commissary purchases. This exchange occurred at a 2021 Commission meeting:

**Sheriff Capt. Andrea Kreiling:** a drawback with getting people out of the jail is that their presence helps offset costs. "It would be just my opinion to leave as many as possible in there so we're also getting revenue, because when they're on ankle monitoring, we're not getting anything." Getting people out of the jail should wait until the county is ready to act on jail upgrades. Income over the past three months from inmates came to $53,235 in May, $48,960 in June and $50,670 in July.

**Sheriff Capt. Andrea Kreiling**: "Right now, we get money back off these inmates because they're using products in the jail, services inside the jail." "When they are out, that is going to be a total loss."

**Commissioner King**: "But, Andrea, what I'm really worried about is a lawsuit."

**Sheriff Capt. Andrea Kreiling**: "Yes," the county making a good-faith effort to reduce jail issues, through repairs or replacing the jail, could be considered a mitigating circumstance in the event of a lawsuit.

**King**: "That's my intention."

However, the Commission never made any "good-faith effort to reduce jail issues" to protect the lives of the detainees; only small repairs—here and there—so it would look good in the event of a lawsuit. And clearly, the price the Commission placed on the lives of the detainees, including my client, was a mere collective $48,960 to $53,235 per year.

In July of 2024, due to a medical emergency of a female detainee from the prolonged and extreme temperatures in the women's pod, all female detainees were transported to a neighboring county jail. One female detainee performed chest compressions on the nonresponsive detainee because jail staff did not respond. Richmond Police and EMT responded to the jail. The Commission is well aware of this incident, because it approved the payments to the neighboring county jail to house the women.

On July 11, 2024, Undersheriff Steve Mendoza testified that the jail was in need of immediate repairs, including toilets, security cameras, fence with razor wire and *"the women's pod needs a*

*new AC unit ASAP.*" But yet, no new adequate AC system was installed, as the women continued to experience extreme heat conditions.

On January 2, 2025, Sheriff Gary Blackwell closed the jail due to immediate safety and security concerns.

Based on review of the case law in the conservative 8th Circuit, I am confident my client's claims will withstand any attempt at summary judgment. This case will be presented to a jury in the Western District of Missouri for the Western Division, which includes Clay and Jackson counties. I am confident that a jury will be outraged by the allegations, particularly considering the admissions already made by Ray County commissioners and Sheriff Childers.

VII.    Demand

Ms. Rush demands              to resolve all claims against the Ray County Commission, and the individuals named in this demand letter. This demand will expire on August 3, 2025.

Sincerely,

/sg/
Jean Peters Baker

# Jean Peters Baker

### Attorney at Law

4050 Pennsylvania
Kansas City, Missouri 64111
jean@petersbakerlaw.com
816-730-4043

Sent via email to Steve Coronado, counsel for the Ray County Commission, at
scoronado@fpsslaw.com on August 26, 2025.

August 26, 2025

Ray County Commission
Heather Maulsby, Ray County Clerk
100 W. Main Street
Richmond, Missouri 64085

RE:     Demand on behalf of my client, Misty Silkwood, former Ray County Jail Detainee

Dear Commission:

I represent Misty Silkwood in her 42 U.S.C. § 1983 14th Amendment conditions of confinement
and 14th Amendment equal protection claims against the Ray County Commission and in their
individual capacities, Ray County, Missouri jail staff Bob Swindler, Tony (last name believed to
be Lamar), Evan Bates, Sky Glenn, Melanie Pumphrey, and former Sheriff Scott Childers.

## I.     Misty's history at the Ray County jail

On or around January 6, 2024, Misty was arrested for child abuse and was subsequently charged
with 2 felony counts of child abuse. She was incarcerated at the Ray County jail from January 6,
2024 to January 31, 2024 (26 days), when she was released on her own recognizance. After
violating her pretrial release conditions, she was re-arrested and detained at the Ray County jail
from May 22, 2024 to June 25, 2024 (34 days). During that time, she was hospitalized in acute
care from June 17-19, 2024, for conditions she believes to be triggered by the extreme heat in the
women's pod at the time. Her hospitalization is discussed below. She was released from your jail
on June 25, 2024, due to her medical condition—that was caused by the jail conditions. She was
incarcerated for a total of 66 days in your jail as a pretrial detainee.

## II.     January 2024: extreme cold

Misty was housed in your jail through the most extreme temperatures: hot and cold. As you know,
the women's pod was a small shed-like structure made of pressed tin or metal. In January 2024,
the women's pod became freezing cold. Misty recalls frequently complaining about the freezing
cold temperatures to staff members, but instead of helping the women detainees, jail staff retaliated
against them, including Misty, for complaining. When Misty and other women complained "too
much" about the freezing cold, jail staff would remove some of their blankets in retaliation for

1

complaining. Women detainees, including Misty, huddled together at night, desperately trying to stay warm by each other's body heat. In addition, to stay warm, Misty and other women frequently ran the hot water from the shower to create warm steam, which provided some warmth inside the pod. As soon as jail staff became aware of the running shower, they immediately shut off the water. When the women, including Misty, explained that they were simply trying to stay warm, jail staff would threaten the women detainees, including Misty, with discipline if they continued to run the hot water from the shower. Misty suffered tremendously from the cold temperatures. Her body shivered, and her fingers, hands, and feet tingled with numbness and pain, as she tried, but could not sleep.

### III.      June 2024: extreme heat

In June 2024, Misty recalls that the women's pod had no working AC, and the temperatures inside the pod were dangerously high for several days in a row. At that time, Misty and other women detainees constantly complained about the unbearable heat, but they were met with only staff retaliation and indifference.

To combat the stifling heat, the door to the women's pod had to be left open, in order to capture some of the spillover AC from the men's pod. The women had to rely on the overflow AC from the men's pod; therefore, leaving the door open was the women's only source of air conditioning and ventilation. However, this simple request to leave the door open was a constant source of reprisal for the women even during the dangerous heat. On more than one occasion, after the women detainees, including Misty, had repeatedly complained about the heat, Tony (last name believed to be Lamar), who worked in the jail, slammed the door shut to the women's pod, cutting off any ventilation, and sealing the women inside their pod. He intentionally shut the door to punish the women, including Misty, and in doing so, he put their lives at great risk of heat exhaustion, heat stroke, and seizures triggged by the heat.

At times, the women had a fan that provided some small relief and much needed ventilation; however, after the women, including Misty, complained about the heat, staff removed their fan, because the women were complaining too much. This happened on more than one occasion.

In addition, to combat the extreme heat, the women, including Misty, would strip off their jail uniforms and lay naked on the concrete floor to help regulate their temperatures, the same floor that was often caked with sewage. The staff, observing the women on the contaminated floor, did nothing to protect them.

Adding to the extreme heat in the women detainees' pod was an open hole in the ceiling where a light fixture used to be. Hot air from the attic flowed into the women's pod through this hole. The women detainees, including Misty, repeated asked that the hole be patched up, but staff refused. The women were once again left to their devices. They used paper from notebooks they were given, and "glued" the paper over the hole with toothpaste, to keep the hot air from flowing into their pod. As soon as the paper was discovered by staff, it was immediately ripped down. There was absolutely no legitimate governmental purpose for ripping down the paper. As was known to you and your staff as early as July 2021, in the attic of the jail, there were plastic water lines, and in the summer, it got so hot in the attic, that the binding glue of those water lines would melt. Thus,

2

even if there was some legitimate governmental purpose in ripping the paper from the ceiling hole, which there was not, that governmental purpose was not proportional to placing the lives of women detainees, including Misty, at great risk from exposure to the extreme heat.

Women, including Misty, frequently ran the cold water in the shower to keep from overheating; but when staff discovered they were running the cold water, staff shut the water off, and threatened the women, including Misty, with discipline if they continued to run the cold water. Misty sweat profusely due to the extreme heat; she'd sweat through her uniform; her hair at the base of her neck would be drenched in sweat. She was unable to sleep due to the stifling heat. The women, including Misty, would remove their jail uniforms, and remain in the nude in their pod, just to get some relief from the extreme heat. Staff, instead of providing some lighter clothing, threatened the women, including Misty, with discipline if they did not wear their hot polyester jail uniforms. When the women complained "too much," about the heat or the cold, jail staff member Tony Lamar, would become infuriated, and would enter the women's pod, and throw their items around, including ripping the blankets and sheets off their beds, and throwing their notebooks and other items up against the wall. Misty was afraid of him, as were the other women.

### IV. Extreme heat leads to Misty's hospitalization for 3 days

On June 17, 2024, after enduring days of extreme heat with no relief, Misty became very ill and passed out 3 or 4 times that day inside the women's pod. Misty learned later that the other women detainees were desperately trying to get jail staff to seek medical attention for Misty, but for hours that day, jail staff refused to help. The women detainee screamed and spelled out "911" with playing cards on the floor in front of the surveillance camera, but were met with silence from staff. The other women began making phone calls to outside family and friends, asking them to call 911 for Misty's condition. The other women detainees were afraid that Misty was going to die.

Finally, at around 8:00 p.m., on June 17, 2024, Misty was transported to the Ray County Memorial Hospital ER by ambulance. Misty was diagnosed with ▮▮▮▮▮▮ with a heartrate of 48 beats per minute. While at the hospital, Misty complained that her brain felt like it was burning. Doctors administered an EKG to Misty, which was abnormal. Misty also had X-rays and CT scans performed, and a UA done with negative results. After 2 hours at the Ray County Memorial Hospital, doctors decided to transfer her to the Liberty Acute Care Facility with Advanced Cardiac Life Support.

At the Liberty Acute Care Facility, doctors administered EKG/ECHO and treadmill tests to Misty in addition to a full blood panel. She was diagnosed with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ Misty was released two days later, on June 19, 2025, back to the Ray County jail. Misty continues to be under medical care for bradycardia that arose while she was in the Ray County jail.

Prior to June 2024, Misty had 2 or 3 syncopal episodes, but they were never serious enough for her to seek medical treatment. Misty believes that the extreme heat inside the jail in June 2024 exacerbated her prior undiagnosed medical condition, to the point of nearly dying. I believe that I will be able to demonstrate through a medical expert that Misty is right. She also reports continuous

bradycardia-related symptoms that started in June 2024 and continue to this day. She currently remains under medical care at Liberty Memorial Hospital for bradycardia.

## V. Steve Mendoza makes request of Ray County Commission for a new AC in women's pod.

Jail staff knew about the extremely dangerous heat in the women detainees experienced in the summer of 2024. In addition to Misty's medical condition as described above, in late June 2024, detainee Debbie Rush experienced ███████████ and ███████████ from the extreme heat— which she repeatedly and desperately complained about to staff. Also, in late June/early July 2024, detainee Tammara Utley passed out unconscious from the extreme heat, and lay on the floor until, at some point, she was awakened by jail staff.

After ignoring the dangerous and life-threatening heat for weeks, on July 11, 2024, Undersheriff Steve Mendoza requested from the Ray County Commission a new AC for the women's pod. That did not happen. Instead, on July 14, 2024, detainee Natosha Chambers began suffering seizures from the extreme heat. For hours as she lie on the floor, the women detainees screamed for help. No help came. The women detainees sent messages to outside family and friends, requesting they call 911. Eventually, medical help arrived.

Jail staff and the Ray County Commission had a pattern of simply not giving a damn about the women detainees suffering from the heat.

## VI. Ray County Commission knew of the dangerous conditions inside their jail since the summer of 2021, but deliberately chose to do nothing.

After conducting a review of your jail in 2021, Septagon Construction and HMN Architects reported numerous problematic issues to you and Sheriff Childers, but there was one singularly reported issue that stands out as life-threatening in nature: **the jail was a furnace oven during the blistering Missouri summers. You have known this since, at least, the summer of 2021; however, there is evidence that you knew before this date.** I am aware that former Carrollton, Missouri Police Chief Robert (Bobby) Turner stopped housing his inmates in your jail due to the poor conditions sometime during his tenure (2013 to October 2019). I expect to learn there were other police chiefs who felt the same. Regardless, you were certainly aware in the summer of 2021.

On July 9, 2021, after conducting a site visit of your jail, HMN was so alarmed at its conditions, that they sought the opinion of Jordan Bartholomew, an electrical engineer. Mr. Bartholomew opined about your jail: there is "likely not enough (or none at all) conditioned outdoor air being delivered and what exhausts they do have for the jail is sucking in the raw outside air through gaps in the construction." Mr. Bartholomew's opinions were shared with you in July 2021.

On July 14, 2021, in its report, HMN warned you that "[t]he mechanical systems in the facility appear to be residential forced air units with air distributed in the attic with both sheet metal duct and flex duct. It is an inefficient method and not code compliant for the occupancy."

On July 23, 2021, Septagon warned you of the same in its report and noted that the jail had a "sheet metal roof" and "sheet metal screwed to the trusses for a ceiling."

On July 30, 2021, HMN Architect Shawn Harding called your jail "a death trap" and "a wood-fired pizza oven". He also said the jail failed fire safety and American Correctional Association guidelines. (*See* Richmond Daily News, "Politics Aside, Ray County needs a new jail," published online July 30, 2021).

One does not need to be an architect or an electrical engineer to understand those warnings. It was clear in the summer of 2021 that the residential AC units in the jail were sized for homes and could not possibly provide the necessary cooling power to handle the larger volume of air and increased heat load in a commercially sized building, like your jail. Moreover, the sheet metal roof and ceiling acted as thermal conductors—transferring heat from the outside into the jail during the hot summer months—turning the jail into a hot, "wood-fired pizza oven."

But unfortunately, it does not stop there. The women detainees reportedly had no working AC unit inside their G-pod, instead they relied on the unpredictably sullen nature of which corrections officer was on duty. The only AC the women detainees received was through their cell door, propped open to capture some of the spillover AC from the men's general population cell. However, in the blink of an eye, a corrections officer would slam that door shut, in an attempt to mete out punishment, sealing the women detainees inside their G-pod with no air flow.

And your response to the life-threatening issue that you were fully aware? Nothing. Instead, you and Childers allowed your antagonistic relationship with each other to override the safety of the lives of the women (and men) trapped in your jail. Childers said as much in a June 16, 2021 Facebook video posted by him on the Ray County, Missouri, Sheriff's Office Facebook page. He said that he had been misled by you into believing that some of the $6M covid funds would be available to help with the jail; instead, he learned that none of those funds would be used to help with the jail. I look forward to discovering your priorities for the covid funds; for example, I know that you spent approximately $150K on a John Deere tractor in 2020, that you failed to inform the public, and as a result, admitted to violating Missouri's Sunshine Law. (*See State of Missouri v. Ray County, Missouri;* 21RY-CV00228). According to your admissions in this lawsuit, you spent $2.7M of covid funds in May 2020, without first providing notice to the public in violation of Missouri's Sunshine Law. I expect to discover your priorities with the use of the Covid and other funds, particularly upon learning of the life-threatening conditions inside your jail.

In addition, on October 27, 2021, after Childers gave a tour of your jail to Fox 4 KC, Commissioner Bob King released the following cryptic statement: "**We know [the jail is] not safe**. We're trying to figure out what we can do to help [Sheriff Scott Childers]. We're willing to work with him any time he wants to work with us. We want the best for Ray County that we can get." (*See* https://fox4kc.com/video/conditions-worsening-at-ray-county-missouri-jail-sheriff-says/7099714).

It is unclear exactly what Commissioner King meant when he stated: the Commission is willing to work with Childers "any time he wants to work with us." I suspect, and certainly discovery in a lawsuit will reveal the answer, the acrimony between the Commission and Childers was related to

the Commission's denial of funding for (1) sunlight barrier tunnels; (2) air purifiers; (3) dehumidifiers; and (4) an industrial washer and dryer—all requested by Childers from you at the August 31, 2024 Ray County Commission meeting. As you know, because Childers explained to you, these items were necessary to help reduce mold and mildew, which was rampant inside your jail, and to help make your jail somewhat more code compliant (that it was not) under the American Correctional Association guidelines.

As a result of your deliberate indifference, the women detainees in your jail in the summer of 2024, including my clients April Ricketson, Misty Silkwood, Debbie Rush, Tammara Utley, Shelby Brannum, Tabitha Spicer, and Natosha (Romano) Chambers experienced the most draconian of punishments: tortuous heat for days and weeks at a time.

## VII. For Misty's entire stay at Ray County jail: prolonged exposure to unsanitary conditions

### A. Raw Sewage

In the women's pod, there were 4 toilets. It was well-known to jail staff that one of those toilets overflowed on a weekly basis, and another would not flush. When the toilet overflowed, raw sewage overflowed on the floor. At times, Misty recalls that the raw sewage was deep enough to seep into her shoes, remained on the floor until it evaporated. The toilet that would not flush, held stagnate sewage on a constant basis for the entire time my client was in the jail. Misty and the other women detainees, had no choice but to constantly stand in, and to breathe in, the contaminants from the raw sewage, which exposed them to disease and illness.

Their pod, as you know, was small, and had no windows and no ventilation, making the stench unbearable. In warmer months, gnats swarmed over the raw sewage on the floor and in the toilets inside of the women's confinement area.

Misty and other women detainees repeatedly complained about the raw sewage to jail staff— requesting that staff clean it or that staff give them cleaning supplies so they could clean it themselves. In response to those complaints, staff retaliated against Misty and the other women by (1) refusing to clean the sewage up from the floor, (2) refusing to give my client and the other women cleaning supplies so they could clean it up themselves, (3) removing any "make shift" cleaning supplies (made from clothing released women detainees left behind) my client and other women used to clean up the sewage, (4) refusing to repair the toilet, and (5) purposefully shutting the only door connecting the women's pod with the rest of the jail, intentionally forcing Misty and the other women to breathe in the toxic fumes from the sewage for the sole purpose of punishing them for complaining about intolerable conditions.

For example, Misty and the other women, repeatedly complained to Bob Swindler, who worked for the jail, about the sewage. Mr. Swindler's response: "You made the mess. You clean it up." But Mr. Swindler intentionally refused to give the woman any cleaning supplies so they could clean up the sewage. Misty, along with other female detainees, made their own cleaning supplies with pieces of clothing intentionally left behind by other women detainees who were released from the jail, to use as make-shift cleaning supplies. Misty and the other women knew they had to hide

their make-shift cleaning supplies, or it would be removed by jail staff for no other reason than to punish these women. Female detainees hid cleaning supplies in a shampoo bottle, when they could, so it would not be taken away from them. However, as you can imagine, those make-shift cleaning supplies, few and far between as they were, soon became grotesquely contaminated from cleaning sewage (and also black mold, which will be addressed later in this demand letter).

## B. Rotting Food

The male detainees threw their food out of their pod and into the jail hallway on the floor and against the wall. No one ever cleaned up this food. This hallway had a large amount of foot-traffic; my client had to walk through this hallway. The food stuck to the floor and walls and rotted and decayed over a period of months. The male detainees would throw more food in hallway floor and walls over top of the rotting and decaying food, this cycle continued for the entire time my client was at your jail. The decaying food attracted flies and other insects. As you know, bacteria and mold from decaying food can contaminate surfaces and be inhaled, leading to illness. Staff's refusal to (1) clean up the rotting food or (2) make the male detainees clean up their rotting food exposed my client to illness, when she had no other choice but to walk through the hallway.

## C. Black Mold

There was a proliferation of black mold in the women's showers and in their pod, caused by the jail's lack of ventilation and inadequate sanitation. The smell of mold was ever present, and worsened with heat, like that of an old wet basement. Misty smelled mold the entire time she was at your jail, and in the sweltering heat in the summer months, the mold made it difficult for her to breathe, which she reported to staff. She and the other women detainees frequently complained about the black mold, but to no avail. Misty and other women detainees asked frequently that staff either clean the mold or give them the supplies to clean the mold, but staff refused. Misty and the other women used their make shift cleaning supplies to clean the mold—frequently, but because they did not have the proper cleaning supplies, their efforts were fruitless.

## VIII. Violations of Equal Protection

Misty recalls how much better the male detainees were treated than the women detainees. Male detainees were given privileges that were never offered to women detainees, such as being trustees, who were often permitted to roam around the jail unsupervised.

## A. Inadequate staff response

Unlike the men's pod, the women's pod and the ad seg cell used for the women were at the very back end of the jail, and although there was a video surveillance camera in the women's pod, staff rarely conducted cell checks of the women's pod. For the women detainees, including Misty, it was nearly impossible to request emergency assistance from staff. The women's screams for help went unheard, as was the case with the female detainee (Nicole Wilms) who had a miscarriage in 2024, the female detainee (Natosha Romano Chambers) who had a heat-induced seizure in 2024, the female detainee (Tammara Utley) who became unconscious due to the extreme heat in 2024, and of course, Misty's own medical emergency on June 17, 2024. With no cell checks and no

assistance button to alert staff, women, including Misty, desperately attempted to request help from staff by waving at the surveillance camera and mouthing the word, "help," and covering the camera with articles of clothing in a desperate attempt to get staff assistance. Other women detainees recalled spelling out the word, "help" with playing cards on the table and floor of the women's pod—hoping staff would see it on the surveillance camera and respond. But staff rarely responded—or if they did, their response was inadequately delayed. This was intolerable, and resulted in an insufferable indignity to the women detainees, including my client, and created a condition that constituted a serious hazard to the women's health and safety.

B. <u>Women's Clothing</u>

Women detainees were treated significantly worse than their similarly-situated male detainee counterparts. To start, the jail uniforms were one piece that buttoned up the front. However, the female uniforms always had buttons missing around the breast and crotch area. They complained about the uniforms, asking for uniforms that covered their private areas, but nothing was done. Furthermore, staff removed women's bras and underwear upon intake, but provided no replacements, leaving the women's breasts and crotch exposed in their jail uniforms.

With no bra and underwear, a jail uniform with missing buttons in the breast and crotch areas, caused the women to be constantly vigilant of how they moved around in the jail so as to not expose their breasts or crotch areas any more than they already were. However, during the greatest extremes of temperature, in desperation the women removed the heavy uniforms and sat in their improvised undergarments. Often, male staff would admonish the women for being in stages of undress and threaten them with additional charges of indecent exposure while they simply tried to regulate their body temperatures.

Women detainees were forced to improvise for undergarments. They often made make-shift "bras" and "underwear" from clothing left behind by women detainees who had been released from jail. These women, having experienced the same, intentionally left some of their clothing behind for the remaining women to use as "bras" and "underwear."

C. <u>Sanitary Napkins and Tampons</u>

The women were degraded further from a denial of feminine hygiene products. Unable to control the timing of biological functions, the women bled on themselves during menstruation cycles because they had no other options. Further, they bled on their makeshift sanitary napkins from clothing left behind by former female detainees. On the rare occasion that women received sanitary menstruation pads, they were not also provided with underwear. One guard told the women to "tape the pad to their leg" and to stop complaining.

D. <u>Recreation: Outside Movement and Trustee Privilege</u>

Jail policy stated: "Recreational Time will be attempted to be offered in the exercise area 1 time per week, weather permitting, if there is sufficient Facility Staff on duty, and privileges have not been taken away." When my client was in your jail, she and the other women detainees were never permitted to go outside in the recreational yard. Ever. Whereas the male detainees were permitted

8

to be trustees and freely move around the jail – inside and outside—including to the "exercise area." Women were not permitted to be trustees. Jail staff clearly applied the policy disparately between the men and women. The only time Misty saw the outdoors was in transport to a court appearance or a transport to the hospital in your jail.

### E.  Recreation: reading materials

Per jail policy, men were allowed to have "1 soft bible, and 2 soft bound books" which could be "exchanged at book cart time." They were also allowed, "1 pair of eyeglasses, 1 writing tablet, [and] anything bought off commissary." Per jail policy, women were not allowed to have any of those items in their pod.

### F.  Recreation: Netflix and Youtube

Men detainees were given access to Netflix on the T.V. in their pod; the women detainees did not have this privilege. Misty recalls that men detainees also had access to YouTube and internet; the women did not. The men would sometimes ask the women if they had a song request, and they might play it for them.

### G.  Basic Necessity: Working A/C

As previously discussed, women had no working A/C in their pod; the men did.

### H.  Basic Necessity: Food

Men detainees who were trustees or worked special projects in and outside of the jail were given special food privileges. Misty, along with other female detainees, recalls one night when staff did not timely feed the women detainees their evening meal, because the staff was busy doling out pizza to some men detainees. After their pizza party concluded, the staff fed the women detainees (and it was not leftover pizza).

## IX.  Demand

Misty demands ███████ to resolve all claims against the Ray County Commission and the individuals named in this demand letter. This demand will expire thirty days from the date of this demand letter. Should mediation be agreed upon, filing of this matter will be stayed.

Sincerely,

*/s/ Jean Peters Baker*

# Jean Peters Baker

### Attorney at Law

4050 Pennsylvania
Kansas City, Missouri 64111
jean@petersbakerlaw.com
816-730-4043

Sent via email at raycountycommissioners@commission.raycountymo.gov and ray@sos.mo.gov; also sent to by U.S. mail to 100 W. Main Street, Richmond, Missouri 64085.

July 10, 2025

Ray County Commission
Heather Maulsby, Ray County Clerk
100 W. Main Street
Richmond, Missouri 64085

RE:     demand on behalf of my client, Tammara Utley, former Ray County jail pretrial detainee

Dear Commission:

I represent Tammara Utley in her 42 U.S.C. § 1983 14th Amendment conditions of confinement, and 14th Amendment equal protection claims against the Ray County Commission, and in their individual capacities, Ray County, Missouri jail staff Bob Swindler, Tony (last name believed to be Lamar), Sky Glenn, Melanie Pumphrey, and former Sheriff Scott Childers. She was incarcerated at the Ray County jail from June 12, 2024 through September 24, 2024, for approximately 104 days, as a pretrial detainee.

In 2017, Ray County charged Tammara with a D felony possession of a controlled substance (meth), and a misdemeanor possession of drug paraphernalia. Utley had moved to Los Angeles, California, and Ray County, through their contracted prisoner transportation company, extradited Utley from Los Angeles back to Ray County. Tammara and the other prisoners were handcuffed and leg-shackled for the entire 4-5 days, as the prison van took a circuitous route to Oklahoma, then to Texas, then back to Oklahoma, then to Ray County, Missouri. On the way, Tammara was sexually assaulted late at night by a male prisoner in the back of the prison van.[1]

Upon arrival to the Ray County jail, Tammara experienced the following:

---

[1] Tammara Utley is not asserting a claim arising out of her sexual assault, against the Ray County Commission nor the individual jail staff members named in this letter; this information is being provided for context. She will be asserting such a claim, however, against the transporting company upon discovering the company's identity.

I.    Conditions of Confinement

A.    Delay in providing meds

When Tammara arrived at the Ray County jail, she was experiencing ██████████████.
Upon arriving to the jail, she brought with her Benadryl and Tylenol prescriptions from the
Los Angeles County jail. These prescription medications were for her ████████████████
symptoms. Tammara had extreme itching from the withdrawal. Ray County jail staff refused
to administer to her this prescribed medication for over a week. Tammara's skin bled from
scratching herself. She continuously complained, requesting her medications. After about a
week, Tammara was able to complain to a nurse at the jail. A couple of days later, jail staff
started administering her medication to her. However, to this day, she has scarring on her skin
from the excessive scratching prior to getting her medications.

B.    Uninhabitable conditions in the women's pod

1.    Unbearable heat

With no working A/C in the women's pod, the only A/C the women got, was the spillover from
the A/C in the men's pod, when the door to the women's pod was propped open. But most of
the time, staff shut that door, sealing the women inside their pod, and greatly increasing their
risk of heat exhaustion, heat stroke, and seizures triggered by the heat.

The women detainees, including Tammara, covered the ceiling lights with pieces of paper
glued with toothpaste. While the lights provided a necessary source of light, they also served
as heat lamps during the summer. They also glued pieces of paper with toothpaste over open
vents in the ceiling, to block the hot attic air from flowing into their pod. When discovered,
staff would remove the paper, knowing the women were attempting to alleviate their exposure
to the extreme heat.

Women detainees, including Tammara, frequently ran the cold water in the shower to keep
from overheating; but when staff discovered they were running the cold water, staff shut the
water off, and threatened the women with discipline if they continued to run the cold water.

To combat the extreme heat, the women detainees, including Tammara, would strip off their
hot sweat-soaked uniforms and lay naked on the concrete floor to help regulate their
temperatures—the same floor that was often caked with sewage. The staff, observing the
women on the contaminated floor, did nothing to protect them from the unsanitary conditions,
which exposed them to disease and infection. Instead, staff threatened the women with
discipline, and even criminal charges for indecent exposure for disrobing.

In addition to her detox symptoms, Tammara experienced lethargy, confusion, dizziness,
nausea, headaches, and an inability to sleep due to the stifling heat in the women's pod.

2. No basic hygiene

Tammara, who was detoxing at the time, sweat profusely due to the extreme heat; her uniform would be soaked from sweat, and she had to remain in that same uniform for days at a time, until staff did laundry, which was supposed to be weekly—but staff often skipped weeks. Keeping the women detainees in the same sweat-drenched dirty uniforms for several days at a time, exposed them, including Tammara, to health risks, such as vaginal infections and skin rashes.

In addition, women detainees rarely got tampons and sanitary napkins, and when they did, they did not get a sufficient supply—making the women wear tampons and napkins longer than they should, which exposed them to infection and toxic shock syndrome.

Moreover, the women rarely got soap; and would wash their uniforms inside the sink in the women's pod, while waiting days until staff did laundry. This is the same sink the women used to wash their hands before eating.

3. Unsanitary conditions

In the women's pod, there were 4 toilets. At least one of those toilets never worked and staff kept a trash bag over it though it remained in that state filled with fecal matter. During Tammara's detention, this toilet was never addressed by staff other than placing a trash bag over it. When one of the other toilets overflowed, raw sewage flowed onto the floor, that was a combination of one or more the following: fecal matter, urine, dirty toilet water, used toilet paper, vomit, and menstrual blood.

Almost always, the raw sewage was deep enough to seep in Tammara's and other women's shoes and would remain on the floor until it evaporated. One of the toilets would not flush and held stagnate sewage of fecal matter, urine, vomit and menstrual blood. Tammara, and the other women detainees, had no choice but to constantly stand in, and to breathe in, the contaminants from the raw sewage, which exposed them to disease and illness.

Their pod, as you know, was small, and had no windows and no ventilation, making the stench unbearable. Gnats, which carry disease, swarmed over the raw sewage on the floor and in the toilets.

The women detainees, including Tammara, repeatedly complained about the raw sewage to jail staff—requesting that staff clean it or that staff give them cleaning supplies so they could clean it themselves. In response to those complaints, staff retaliated against my client and the other women by (1) refusing to clean the sewage up from the floor, (2) refusing to give the women cleaning supplies so they could clean it up themselves, (3) refusing to repair the toilets, and (4) purposefully shutting the only door connecting the women's pod with the rest of the jail, intentionally forcing Tammara and the other women to breathe in the toxic fumes from the sewage for the sole purpose of punishing them for complaining about intolerable conditions.

3

4. An extremely ill female detainee results in staff retaliation

Within days of Tamarra arriving to the Ray County jail, a female detainee became gravely ill inside the women's pod. Tamarra observed the woman, who was clearly in medical distress, with "gray" colored clammy skin. The woman lay on her bed, not moving and not speaking for days. The other women detainees, including Tamarra, were extremely concerned and attempted to alert staff to the emergency situation. The women spelled out "9-1-1" on the floor of the women's pod with playing cards left behind by a former woman detainee, in the hopes that staff would see the message on the video surveillance camera. But staff did not respond.

The women detainees also screamed for help. The women's pod was located in the very back of the jail, a distance away from any staff, and staff did not conduct cell checks. But the women's screams for help were heard by the male detainees, whose pod was next to the women's pod. The male detainees heard the women screaming for help, then alerted staff that the women were in distress. But still, no staff responded.

Without help and growing more desperate, the women detainees then started reaching out to friends and family on the outside, by phone and messaging, requesting emergency assistance for the woman detainee who was gravely ill. After doing so, staff finally responded to assist the woman. She was taken to the Ray County Hospital, then immediately transported to the Liberty, Missouri Hospital where she remained for a few days, before returning to the jail.

In retaliation for the women reaching out to outside family and friends, and jail staff receiving calls from outside of the jail requesting help in the women's pod, staff removed the women's ability to make calls and message; punishing the women for seeking emergency help. Days passed before this service was reactivated for the women. Staff also removed the women's playing cards that they used to spell out "9-1-1" on the floor. Staff gave the women, including Tammara, a very clear message: any help you seek from staff or the outside will be met with reprisal.

C. Uninhabitable Conditions in the Ad Seg Cell

About 2-3 weeks after her arrival, Tammara was placed in an administrative segregation (ad seg) cell, because she got into an altercation with another female detainee. She was inside the ad seg cell for approximately one month. As deplorably bad as the conditions were in the women's pod, the conditions inside the ad seg cell were even worse.

1. Extreme wetness and moisture

Inside the ad seg cell, there were no lights, no A/C, no working fan, and no ventilation. The shower leaked non-stop, and water constantly seeped into the cell, from behind the paint, which was peeling off the wall. Her bed was always wet from the water seeping down from the wall, which made it impossible to sleep. At times, she tried to sleep standing up, just to stay dry. She could not sleep on the floor, because it was always wet with anywhere from ½" to 1" of water.

4

She complained about these conditions, when jail staff brought food back to her, but her complaints were ignored.

She attempted to alleviate the issues herself, by making a shower curtain from a trash bag, to keep any additional water from getting on the floor when she showered (with cold water), which she did often to combat the extreme heat inside the ad seg cell. She got think blankets and folded them on the floor to soak up the water. Any time she did that though, the blankets on the floor would get sopping wet almost immediately.

Gnats and flies swarmed everywhere inside the ad seg cell due to the warm stagnate water on the floor, in the shower, and on her bed. The gnats and flies also made it very difficult for her to sleep. Due to the extreme heat, it was very difficult for her to breathe, and her breathing was very labored. Often, as she breathed in through her mouth, she would unintentionally breathe in and swallow gnats, which was impossible to avoid, due to the sheer number of gnats in her cell.

2.  Black mold

Unsurprisingly, there was an extreme amount of black mold inside the ad seg cell. The stench from the mold made it very difficult to breathe. She started getting headaches while inside the ad seg cell, and the headaches soon started occurring daily, which she believes was from the mold coupled with the extreme heat and poor sanitation conditions.

3.  Extreme heat

The extreme heat inside the ad seg cell cannot be overstated. There was no A/C, no ventilation, and no working fan. It was so hot and humid from all the water in the cell that she had an extremely difficult time breathing. From the heat, she experienced on a daily basis: ████████████ She would remove her hot jail uniform and remain in the ad seg cell naked, just to attempt to stay cool. Evenings did not bring relief from the heat since the women's pod received so little ventilation. She panicked from her inability to breathe in the stifling and prolonged heat. She had ████████████████, believing she would die inside the ad seg cell from the blistering heat. And no one helped her.

She repeatedly begged for relief from the heat when staff brought food to her, but staff did nothing. When she panicked from her inability to breathe, she screamed and kicked her cell door to get help from staff. But no one ever came to help. She would also stick hands out of the food port (chuck hole) and wave at the video surveillance camera in the hall, in attempt to get help from staff. She would attempt to stick her head in the food port (chuck hole) in a desperate attempt to get air. Instead of helping her, however, staff shut her food port (chuck hole), her only ventilation inside the ad seg cell, to punish her for complaining.

One particular day, she fell unconscious to the concrete floor from the extreme heat. She does not know how long she lay on the floor unconscious, but believes it was for some significant time. A staff member found her unconscious; she awakened to a staff member calling out to

5

her. Tammara told the staff member that she passed out from heat exhaustion; no medical assistance or intervention was offered to her. A few days later she was moved back to the women's pod.

### D. Unsanitary conditions resulted in a pink eye breakout

While she was in the ad seg cell, Tammara contracted pink eye. Her eyes itched and were irritated. She suspected, but did not realize she had pink eye, until she went to court, and was able to see herself in a mirror. She requested eye drops or some other type of relief from the pink eye from staff but received nothing. Tammara believes the pink eye was caused by the unsanitary conditions of the jail. When Tammara returned to the women's pod, she learned that other women detainees also had pink eye.

### E. The women's pod: a woman detainee has heat-induced seizures

Tammara got no relief from the heat upon re-entering the women's pod. It continued to be dangerously hot inside the women's pod, just as it was before. She continued to experience heat-related symptoms: profuse sweating, headaches, nausea, dizziness, and lethargy.

In mid-July 2024, a fellow woman detainee suffered a heat-induced ▮▮▮▮. Tammara recalls this event vividly. The woman fell between the bunks and began seizing. One of the women detainees, began providing first aid to the seizing woman, and the remaining women, including Tammara, began screaming for help. Staff disregarded their cries for help. Desperate, some women detainees reached out to family and friends on the outside, through calls or messages, asking for emergency help. An ambulance came, approximately 40 minutes after the women began screaming for help. At no time prior to the ambulance arriving did staff respond to assist the seizing woman.

Soon after, the women detainees, including Tammara, were transported to the Caldwell County jail for a few days, due to the dangerously hot conditions in the women's pod. Immediately after going outside to get on the transport van, the women detainees, including Tammara, felt relief from the heat. As hot as it was outside, it was still relief from the heat inside the women's pod.

### F. Inadequate amount of food

Tammara was provided inadequate amounts of food while detained in Ray County. The women detainees would attempt to ration their food to stave off hunger. By way of example, my client would save half of her meager bologna sandwich for later in the day when she would awaken from hunger pains. She would consume coffee throughout the day in an effort to pacify her hunger. She was provided stale rice crispy treats, but she was grateful for any food. Often, she was unable to sleep due to her hunger. She lost weight during her time of incarceration. She repeatedly complained about the lack of food to jail staff, but no one addressed her concerns.

6

## II.    Violations of Equal Protection

### A.    Inadequate staff response

Unlike the men's pod, the women's pod and the ad seg cell used for the women were at the very back end of the jail, and although there was a video surveillance camera in the women's pod, staff rarely conducted cell checks of the women's pod. For the women detainees, including Tammara, it was nearly impossible to request emergency assistance from staff. The women's screams for help went unheard, as was the case with the female detainee who had a miscarriage in 2024, the female detainee who had a heat-induced seizure in 2024, and my client, Tammara, who became unconscious due to the extreme heat in 2024. With no cell checks and no assistance button to alert staff, women, including Tammara, desperately attempted to request help from staff by waving at the surveillance camera and mouthing the word, "help," and spelling out the word, "help" with playing cards on the table and floor of the women's pod—hoping staff would see it on the surveillance camera and respond. But they rarely did—or if they did, their response was inadequately delayed. This was intolerable, and resulted in an insufferable indignity to the women detainees, including my client, and created a condition which constituted a serious hazard to the women's health and safety.

### B.    Women's Clothing

Women detainees, including Tammara, were treated significantly worse than their similarly-situated male detainee counterparts. To start, the jail uniforms were one piece that buttoned up the front. However, the female uniforms always had buttons missing around the breast and crotch area. They complained about the uniforms, asking for uniforms that covered their private areas, but nothing was done. Furthermore, staff removed women's bras and underwear upon intake, but provided no replacements, leaving the women's breasts and crotch exposed in their jail uniforms.

With no bra and underwear, a jail uniform with missing buttons in the breast and crotch areas, caused the women to be constantly vigilant of how they moved around in the jail so as to not expose their breasts or crotch areas any more than they already were. Often, male staff would admonish the women for being in stages of undress and threaten them with additional charges of indecent exposure while they tried to regulate their body temperatures.

Women detainees often made make-shift "bras" and "underwear" from clothing left behind by women detainees who had been released from jail. These women, having experienced the same, intentionally left some of their clothing behind for the remaining women to use as "bras" and "underwear."

### C.    Inappropriate Sexual Overtures

Male detainees, who were trustees, were permitted to crawl into the attic space above the women's pod and peer into the women's pod through the hole in the ceiling where the light fixture used to be. The male detainees would peer at the women as they were in various stages of undress. One of these areas where a male detainee could see through a hole was over the only shower area provided for the women.

When the female detainees left their pod for any reason, they walked down a long hallway with a guard. The male detainees would catcall the women as they passed and never with rebuke by a guard. This hallway was known by female detainees for unwanted sexual comments, gestures and harassment directed at the women, adding to the already demeaning treatment they endured.

D. Sanitary Napkins and Tampons

Women were denied access to feminine hygiene products and bled on themselves and made their makeshift sanitary napkins from clothing left behind by former female detainees.

E. Recreation: Outside Movement and Trustee Privilege

Jail policy stated: "Recreational Time will be attempted to be offered in the exercise area 1 time per week, weather permitting, if there is sufficient Facility Staff on duty, and privileges have not been taken away." When my client was in your jail, she and the other women detainees were never permitted to go outside in the recreational yard. Whereas the male detainees were permitted to be trustees and freely move around the jail – inside and outside—including to the "exercise area." Women were not permitted to be trustees. Jail staff clearly applied the policy disparately between the men and women.

F. Recreation: reading materials

Per jail policy, men were allowed to have "1 soft bible, and 2 soft bound books" which could be "exchanged at book cart time." They were also allowed, "1 pair of eyeglasses, 1 writing tablet, [and] anything bought off commissary." Per jail policy, women were not allowed to have any of those items in their pod.

G. Recreation: Netflix

Men detainees were given access to Netflix on the T.V. in their pod; the women detainees did not have this privilege.

H. Basic Necessity: Working A/C

As previously discussed, women had no working A/C in their pod; the men did. That is no more evident than what occurred in mid-July 2024 wherein a female detainee had a heat-induced seizure, and jail staff, with the Commission's blessing, made the decision to move the women detainees from the Ray County jail to the Caldwell County jail on an emergency basis, due the dangerous heat conditions in the women's pod. After a few days the women returned to the Ray County jail, but soon thereafter, the extreme heat conditions returned.

8

III.     The Commission were aware of the conditions

I will not repeat myself here, but I corporate by reference as though fully set forth herein, the section regarding the Commission's knowledge of, and deliberate indifference to, the deplorable jail conditions, discussed in my demand letter on behalf of my client, Deborah Rush.

Demand

Tammara demands ███████ to resolve all claims against the Ray County Commission, and the individuals named in this demand letter. This demand will expire on August 10, 2025.

Sincerely,

Jean Peters Baker

# Jean Peters Baker

### Attorney at Law

4050 Pennsylvania
Kansas City, Missouri 64111
jean@petersbakerlaw.com
816-730-4043

Sent via email at raycountycommissioners@commission.raycountymo.gov and ray@sos.mo.gov;
also sent to by U.S. mail to 100 W. Main Street, Richmond, Missouri 64085.

July 10, 2025

Ray County Commission
Heather Maulsby, Ray County Clerk
100 W. Main Street
Richmond, Missouri 64085

RE:     demand on behalf of my client, Jessica Wardlow, former Ray County jail detainee

Dear Commission:

I represent Jessica Wardlow in her 42 U.S.C. § 1983 PREA claim against former Ray County jail staff member, Evan Bates, in his individual capacity.

Jessica was incarcerated at the Ray County jail for 28 days from February 22, 2024 through March 21, 2024, as a post-conviction detainee. Jessica was in custody related to a 2018 D felony conviction of possession of acetaminophen hydrocodone bitartrate.

Almost immediately after arriving to the Ray County jail, Jessica began suffering severe symptoms from ██████████████. She had extreme ███████████████████████████████ ████████████████████████████ She requested medical attention from staff but was offered only aspirin.

Jessica—already thin—lost weight in a very short period of time in custody. At about 110 lbs., 26-year-old Jessica was either defecating from the extreme diarrhea or lying on her cot in a constant sweat. There is no question that staff—including former jail staff member, Evan Bates—observed, in person and by video surveillance, the vulnerable state Jessica was in. In Jessica's condition of vulnerability, Bates facilitated a sexual assault on Jessica.

Bates, pulled Jessica out of the women's pod, telling her, he needed to take her blood pressure, which was odd, Jessica thought, because she had no blood pressure issues. However, she was relieved to be finally getting some medical attention for her withdrawal symptoms (or so she thought).

Bates handcuffed Jessica and led her to the "medical room"—which would end up being Jessica's first and last time in there. Once inside, Bates checked Jessica's blood pressure while she remained

1

handcuffed. Then suddenly, Bates called out to someone, and a male trustee, who had been hiding behind the door, appeared, uncuffed and unshackled. The male trustee immediately grabbed Jessica's breasts over her uniform. Jessica tried to push him away, but he was much bigger than Jessica, and his hands were free; hers were not. Besides, she knew she would not be able to leave with Bates there. Bates stood next to Jessica, watching the male trustee grab and grope her. Jessica, still handcuffed, was terrified. The male trustee then placed his hands inside Jessica's uniform, touching her vagina and her buttocks, as Bates continued to watch. Jessica froze, fearing what more would happen to her by the male detainee and Bates.

Daniel Orr, another jail staff member, called out to Bates, from down the hall, and Bates motioned to the male detainee to stop. The male detainee complied as ordered by Bates. Still handcuffed, Jessica adjusted her clothing, and Bates walked her back to the women's pod. After returning to the pod, Jessica was scared, shocked and confused. Later she noticed red marks and soreness of her wrists where the handcuffs were.

Jessica never reported the sexual assault, because she feared she'd be disbelieved and likely suffer reprisal from Bates. After all, she thought, there was nothing preventing Bates from doing this again.

Even though Bates never personally assaulted Jessica, his actions directly created the risk of harm to her. Furthermore, Bates' facilitation of the assault—actively enabled the uncuffed male detainee to access Jessica, who was handcuffed, and his observation of the assault without intervention, demonstrated his deliberate indifference to Jessica's safety. His actions directly contributed to the risk and ultimate harm done to her. This assault would not have occurred but for Bates' actions.

As a result of Bates' actions, Jessica's extreme anxiety, insomnia and loss of appetite was greatly exacerbated.

Jessica demands ███████ to resolve her claim against Evan Bates. This demand will remain open for 30 days following the date of this letter.

Sincerely,

Jean Peters Baker